307 So.2d 28

**Laurens S. CLARK**

**v.**

**STATE.**

**7 Div. 237.**

Court of Criminal Appeals of Alabama.

Jan. 21, 1975.

George W. Hodges, Jr., Ashville, for appellant.

William J. Baxley, Atty. Gen., Montgomery, and Jonathan P. Gardberg, Sp. Asst. Atty. Gen., Mobile, for the State.

HARRIS, Judge.

Appellant was convicted of murder in the first degree and the jury fixed his punishment at life imprisonment in the penitentiary. Prior to arraignment the court ascertained that the accused was indigent and counsel was appointed to represent him at arraignment and throughout the trial. He pleaded not guilty. After conviction he sought and obtained a free transcript and trial counsel was appointed to represent him on appeal.

On the late afternoon of June 21, 1972, a young married woman, twenty-eight years of age, who was living with her husband and four minor children, was found dead in her automobile on an access road about 300 feet from the paved or blacktop portion of the Saine-Margaret road in a rural area of St. Clair County, Alabama. This access road was a few yards north of and to the right of the Saine Creek bridge. She had been shot one time with either a .32 or .38 caliber pistol. The bullet that killed her was not found. There were no actual eye witnesses to the murder but there were at least three witnesses who placed appellant at or near the scene of the homicide a few minutes before or a few minutes after she was killed. The state was compelled to rely on circumstantial evidence to fasten guilt on appellant.

When the state rested its case in chief, appellant moved to exclude the state's evidence on the ground that a prima facie case had not been made out. This motion was overruled and, thus, puts us to the task of setting forth the evidence in some detail.

There are some uncontradicted facts. The deceased was found in a 1965 red Bonneville (Pontiac) automobile bearing a 1972 Alabama license tag, Number 1–38295. Her husband's .357 magnum pistol was clasped in her right hand. There was one spent cartridge and five live cartridges in the magnum. When the officers first saw this pistol in the deceased's hand, they thought she had committed suicide. A subsequent autopsy conclusively ruled out the suicide theory. It was also uncontradicted that appellant was the owner of a 1964 blue Dodge station wagon at the time of the killing. This station wagon had a 1972 Alabama license tag, Number 59–15585.

Mrs. Alma Henry, Route Two, Leeds, Alabama, testified that she had known the deceased thirteen years and that in addition to her duties as a housewife she sold artist paint. The deceased came to her house at 5:00 P.M. on June 21, 1972, to pick her up to deliver two orders of paint that Mrs. Henry had sold for her. She got in the car with the deceased and they made the two deliveries, collecting around $21.00. After making these deliveries, the deceased carried Mrs. Henry back home. The time was 6:30 P.M. Mrs. Henry knew that the deceased was going directly to her home by the Saine-Margaret road as that was the shortest route. Mrs. Henry cautioned the deceased to lock the doors to her car and she would call her in thirty minutes to see if she arrived home safely. The deceased told Mrs. Henry she would get out her pistol for protection if the occasion arose and she saw the deceased take the pistol from her pocketbook and it was in her hand as she drove from Mrs. Henry's home. That

was the last time Mrs. Henry saw the deceased alive. Mrs. Henry waited thirty minutes and started to the telephone to call the deceased, but the telephone rang and it was the husband of the deceased calling her to inquire about his wife. Mrs. Henry told him the deceased left her home thirty minutes before going to her home.

Mr. James H. Kelly lived on the Saine-Margaret road on June 21, 1972, and in order to get to his home he had to cross the Saine Creek bridge which was a narrow wooden bridge and two vehicles could not pass on the bridge at the same time. There were no guard rails on the bridge. There was another access road a few yards south of the Saine Creek bridge which led off to the right of the Saine-Margaret road. It was late afternoon on June 21, 1972, and he was driving on the road leading to his home and had his wife and children in the car with him.

As Mr. Kelly and his family approached the Saine Creek bridge, they came upon a 1965 red Bonneville (Pontiac) automobile blocking the highway between the first right access road and the bridge. They saw a white man in the Bonneville partially on the passenger side of the car jerking around toward the driver's side trying to get to the steering wheel to drive the car out of the highway. They got the impression that someone was in the driver's seat that was thwarting his efforts to get in the driver's seat. The Kelly family did not see a woman in the Bonneville and did not see another automobile any where near the scene. Mr. Kelly saw glass in the main traveled portion of the highway which was to the left side of the car. He also saw a tripod type of construction sign with a blinking yellow light that is commonly seen at road construction sites throughout the state. It, too, was standing a few feet off the pavement on the left side of the highway. They saw the man manage to get control of the steering wheel and drive the Bonneville across the bridge and turn into the access road just a few yards beyond and to the right of the highway. The Kelly family proceeded across the bridge and went on to the town of Margaret. A few minutes later the Kellys came back on this same highway and saw the same construction site sign in the same place that they originally saw it. They did not see a man or an automobile and they drove south on the Saine-Margaret road to a mountain and turned around and went back toward the Saine Creek bridge. As they approached the bridge they noticed the bridge construction site sign was gone and they still did not see a man or an automobile and they were gone only about two and one-half (2½) minutes.

Mr. Kelly carried his wife and children to his father's house and left them there. He got his father, two brothers and some shotguns and returned to the Saine Creek bridge. They got out of the car and walked down the access road where Mr. Kelly saw the man drive the red Bonneville and they found the automobile. Mr. James Kelly approached the rear of the car from the left side and went to the door on the driver's side and saw that most of the glass in the window of the door had been knocked out. He looked inside and saw the lifeless body of a woman, a lot of blood and broken glass on the front seat and the floor board of the car. He left his father and brothers to secure the scene and went to the nearest house with a telephone and told a woman to call the Sheriff and tell him that a woman had been killed near the Saine Creek bridge and was still in her automobile. After the Sheriff was notified he returned to the crime scene to help keep people away from the car.

Mary Ellen Lemons testified that she lived in Odenville, a community not too far from the scene of the crime, and that she was familiar with the Saine-Margaret road. On the date in question she was driving her automobile along or upon this road about 6:15 P.M. As she approached the bridge, she saw a man standing on the side of the road a short distance south of the bridge. He was dressed in Khaki green, wearing heavy shoes and had on

some type of head covering. As she approached the bridge, the man dropped his head. She described the man as being about six feet tall and was of dark complexion. He had sloped shoulders and sharp features. She judged his weight to be 185 to 200 pounds. She observed a yellow sign at his feet but did not recall if the light was blinking. She thought it most unusual for a man to be standing near the bridge where no construction work was going on. Since he was dressed in Khaki green and she thought he was a soldier walking home, she slowed down her car to see if he was someone she knew as she would have given him a ride. The man did not try to stop her and she continued on her journey to the Saine Community. She stayed at the home she was visiting for forty-five minutes and as she was leaving to return to her home, a young man, Adrian Kelly, stopped her and told her to be careful as a woman had been killed at the bridge.

She returned home by the same route and when she got to the bridge she stopped and talked to James Kelly and looked down the access road north of the bridge and saw the Bonneville. She did not go to the car. She did not see the man that she had seen forty-five minutes before nor did she see the yellow road construction sign but she did see broken glass in the road. Lawson Kelly followed her across the bridge and another man followed her down the highway to be sure she got home safely. She was in school in Gadsden when a line-up was conducted and her mother was unable to get in touch with her. At the time of appellant's trial, she was teaching school.

On June 21, 1972, Mr. Myran Lund was driving his car on the Saine-Margaret road. The time was about 6:15 or 6:20 P. M. His wife, Virginia, and his thirteen-year-old son, Roger, were in the car with him. His wife was in the back seat and his son was on the passenger side in the front seat. They lived at Branchville on Highway 25 which runs north and east of the Saine-Margaret road. On this occasion they were going to Margaret to pick up a kinsman to go to a restaurant in Oneonta for dinner. Their testimony dove-tailed in harmonious and material respects as to what occurred at the Saine Creek bridge with reference to the road sign with the yellow blinking light and the description of the man standing just south of the bridge. Mr. Lund brought his automobile almost to a complete stop as he thought the man was going to stop him. The man had a red flag in his hand but he did not try to stop them. They got within a few feet of the man and he turned his head to the side and was looking at the sign and they got only a profile look at him at that time. They realized something strange was going on for a man to be standing on the road near a bridge with a construction type sign and a red flag when neither the Saine-Margaret road nor the Saine Creek bridge was under construction or in need of repair. Mr. Lund started across the bridge and both Mrs. Lund and the boy looked back at the man, who at that time, was looking directly at their automobile and they got a full-face view of the man.

Roger Lund described the man as wearing a green shirt, green pants, boots with crepe soles, a plastic type cap with a long bill, and that he was a heavy-built man. A pair of boots were taken from a camper belonging to appellant and they were marked for identification as State's Exhibit 13 and they were shown this witness and he said these were the same type boots the man was wearing when he saw him at the Saine Creek bridge. These boots were obtained pursuant to a search warrant.

Mr. Lund described the man as six feet tall, dark complexion with sharp features, and in his mid-forties; that he had on a cap and was wearing green type work clothes and he judged his weight to be about one hundred and ninety pounds.

Mrs. Lund described the man as wearing dark green work clothes and a dark green vinyl type bill cap. He was about six feet

tall and had a long pointed nose and sharp face, dark eyes and his hair was down longer than his cap and it was dark and gray. He was very sunburned looking, he looked like he had been out in the sun a lot. She judged his age to be between forty and forty-five.

Appellant was arrested on July 6, 1972, and on July 7, 1972, a line-up was conducted which was viewed by the three Lund witnesses. More will be said about this line-up later in this opinion.

In order to keep events in some form of sequence, we will go back to the scene of the crime.

Margaret Farley lived one-quarter of a mile north of the Saine Creek bridge and had lived at the same place all her life. She testified that James Kelly came to her house and asked her to call the Sheriff and tell him that a woman had been killed near the bridge and was in her automobile. She had seen James Kelly drive by her house two or three times before he stopped to get her to call the Sheriff. His family was in the car with him and the children waved to her and her husband who were sitting on the front porch.

She also saw James Kelly's father and brothers pass her house going toward the bridge. The rapid activities of the Kelly family passing up and down the road caused her to believe that someone in their family was sick. While still sitting on the porch with her husband and before James Kelly stopped at her house, she saw a blue Dodge station wagon pass her house. A white man was driving and he was alone in this vehicle. She observed a box on the dash of the station wagon. It was later shown that this was a kleenex box.

Appellant's 1964 blue Dodge station wagon was towed to a garage in Pell City on orders of the Sheriff after appellant was arrested on July 6, 1972, on a warrant charging him with leaving the scene of an accident on or about the night of June 19, 1972. Mrs. Farley was asked to go to this garage in Pell City to see if she could identify this Dodge station wagon as the vehicle that passed her house on the late afternoon of June 21st. The kleenex box was still on the dash of this vehicle. Mrs. Farley positively identified this Dodge station wagon as the vehicle that she saw pass her house on June 21st. A photograph of this vehicle was exhibited to her at appellant's trial as State's Exhibit No. 17 and she stated that this was the same Dodge station wagon she saw on June 21st and pointed to the kleenex box that was still on the dash. The photograph was admitted in evidence over appellant's objections.

A search warrant was issued on July 7, 1972, to search this station wagon and in the glove compartment the officers found three and one-half pieces of Dentyne chewing gum and also the kleenex box, which, of course, was in plain view as is shown in State's Exhibit 17 which is before us.

Mr. Phillip Richardson, brother-in-law of the deceased, went to the Saine Creek bridge the next day after the homicide and found a number of chewing gum wrappers from Dentyne gum near an old sign post that did not have a sign on it. He put these wrappers in an envelope and turned them over to the Sheriff. After a proper predicate was laid, the court permitted these wrappers into evidence for whatever probative value they might have for the jury's consideration.

Ralph Kelly testified that he was riding in his brother's, Lawson Kelly's, car in the late afternoon of June 21, 1972, on the Saine-Margaret road and saw a blue station wagon backing out of one of the access roads near the Saine Creek bridge. The next time he saw this blue station wagon was at the jail in Pell City and he identified this vehicle as the one he saw at the Saine Creek bridge on June 21, 1972. He was shown State's Exhibit Number 18, which was a photograph of appellant's 1964 blue Dodge station wagon

and positively identified the station wagon as the one he saw at the bridge on the day of the homicide. This Exhibit was admitted into evidence over appellant's objections.

Sheriff Clemons Roe of St. Clair County testified that he was called at his home at 7:20 P.M. on June 21, 1972, and told that the body of a woman was in her automobile near the Saine Creek bridge. He called Mr. Robert B. Johnson, Assistant State Toxicologist in Birmingham, to meet him at the homicide scene and he also called a number of state and local police officers to meet him at the bridge. When the officers arrived they examined the body of the woman and found she was dead. They observed blood and glass on the front seat and floor board of the car. The body was released to a funeral home in Pell City where Mr. Johnson performed an autopsy. Before following the body to the funeral home, Mr. Johnson made an inspection of the scene. He found the print of a man's shoe or boot on the ground next to the right door of the Bonneville. According to the testimony of Mr. Johnson the shoe or boot that made the print had large ridges on the sole portion of the boot and particularly the heel portion. A photograph of this print was shown to Mr. Johnson and he testified that his examination of appellant's boots was consistent with the footprint in the photograph exhibited to him.

Mr. Johnson also testified that he examined appellant's boots and found traces of tar caught between the ridges of the left toe and the sole of the left boot; that this was black tar type material. He described the Saine-Margaret road in these words:

"It was a black top road. It appeared to me, the tar and gravel had been applied relatively recent, a matter of days, or a week or two."

At the funeral home Mr. Johnson took a blood sample from the body of the deceased and it was negative for alcohol.

Mr. Johnson described the autopsy as follows:

"There was an injury to the left side of the neck. I followed it up to the mouth, to a wound on the right cheek. I determined from it that the bullet went from the left side of the head to the right. The subject died from a brain concussion as well as a shock and injury. The injury to the head was of a concussion type. No bullet was found. The only evidence of a bullet wound in this case was from the broken dentures. I identified a small smear of lead on a piece of dentures that were broken. This was caused by a lead bullet either from a .32 or .38 caliber pistol. The entrance wound was about three-eights of an inch in diameter and the exit hole was three-quarters of an inch in diameter with rough edges and one tear off from the main hole itself."

Mr. Johnson did not find any traces of gun powder or powder burns. He was asked on cross-examination if this could have been a suicide and his answer was negative:

"If this had been a suicide, or a self-inflicted wound, particularly with a gun this large (.357 magnum) I would have expected to find powder burns around the wound of the nature I saw. This is a contact wound, with a rather powerful gun, but in a case like this, you would expect to see a good deal of powder, the residue of unburned grains of powder. We didn't find this, and in addition to that, after examining the broken dentures, I found a smear of lead on the outside of the left side of the dentures. The hold on the right side, inasmuch as the dentures were fragmented, the hole was enlarged or at least—not by just the bullet itself, but the part of the broken denture exiting from the hole in the right cheek, as well. So, after considerable examination of it, I finally decided that the wound on the left was the entrance wound and the wound on the

right was the exit hole and it was jagged."

A good deal of blood on the ground in streams and spots was found fifteen to twenty feet behind the Bonneville and it appeared to be fresh blood. The Sheriff found a stick and a bone on the ground behind the car and they had blood stains on them. Mr. Johnson was not able to identify the blood on the stick but the blood on the piece of bone was Type B. The deceased's blood was Type O. It was Mr. Johnson's opinion that the blood on the bone was more than 48 hours old.

The .357 magnum was test fired into a card board with the five unspent or live cartridges at distances of twenty-four inches, thirty inches, and thirty-six inches from the object and in each instance left residue of gun powder around the hole in the card board. Mr. Johnson, whose qualifications as a firearms expert were admitted by counsel for appellant, said the deceased could not have shot herself with the .357 magnum pistol without leaving residue of powder around the entrance wound. Besides this witness had already testified that the deceased was shot with either a .32 or .38 caliber pistol and still there were no powder burns or residue of powder on her person.

Back to the line-up. After appellant was arrested on July 6, 1972, he was carried to the St. Clair County jail and charged with leaving the scene of an accident. On the night of July 7, 1972, a line-up was had in the courthouse in Pell City. The events concerning the line-up were described by the District Attorney on a hearing of appellant's motion to suppress the testimony of the witnesses who viewed the line-up as follows:

"MR. ROBINSON: All right. I am Charles Robinson, District Attorney for Saint Clair and Blount Counties. On the 6th of July, 1972, Laurens Clark, the defendant in this case, in this murder case here, was arrested for leaving the scene of an accident.

"He was arrested and brought to the County jail at Pell City. And about an hour or so later, after his arrest based on the description that the witnesses had given us, based on the type of car that had been seen in the area at the time of the murder on June 22, (sic) and based on the type of car that Mr. Clark had, we felt that it was necessary that a line-up be had for identification purposes.

"At the time of the line-up, Mr. Clark was not under arrest for murder, He was under arrest for leaving the scene of an accident. Just minutes prior to the line-up, myself and in the company of Sheriff Roe and Lieutenant Reins went over to the jail where Mr. Clark was at that time.

"We had procured six people besides Mr. Clark to be in a line-up. After going to the jail and having the jailer bring Mr. Clark down to the office, I advised Mr. Clark in the presence of Lieutenant Reins and Sheriff Roe that he was not under arrest, as he knew he had already been advised what he was under arrest for, that he was not under arrest for murder but that he was a suspect in a murder case that had happened on June 21, 1972, that a person fitting his description and driving the type car that he had was seen in that area.

"I advised him that he would have to submit to this line-up, but that under the law he was entitled to counsel, to have an attorney present there before and during the line-up.

"Mr. Clark, in turn, advised me that he didn't know what I was talking about. He didn't need a lawyer, to be before a line-up. We had made arrangements, in case he wanted a lawyer, to call Judge Waid in Oneonta to have him appoint a lawyer for him, but Mr. Clark again advised that he did not want a lawyer.

"This waiver was given in the presence of myself and Lieutenant Reins and Sheriff Roe. After advising us that

he didn't want a lawyer, we brought him over to the courthouse. And as the Sheriff mentioned, they had the line-up set up. I mean they had it set up to have the line-up. They had lights facing the parties that were going to be in the line-up.

"They had numbers on the floor, one through seven. Mr. Clark was given his choice of what number he wanted. The witnesses that viewed the line-up at that time, Mr. and Mrs. Lund and their son were stationed in the back of the Tax Assessor's office. He has two rooms there. The outer office, where he waits on people, and then a private office in the back. They were not allowed to view the line-up until it was in place, and then only one at a time. We brought each one of those parties out of that outer office and brought them up to the window, and each one of them viewed the men in the line-up and wrote down, without making a sound, on a piece of paper which—I think Sheriff Roe has the number of the person that they identified as being at the scene of the murder on June 21.

"After they had done this, they were, each one of them, one at a time was taken down to the Sheriff's office and was not put back in with the other people that still had to view the line-up.

"They were never mixed up together. After the identification, a warrant was taken for Mr. Clark for murder of Linda Richardson. He was brought to the jail here in Ashville."

 There were seven men in the line-up including the defendant. One was a jail prisoner and the other five were citizens in and around Pell City. At least three of the other five citizens were public officials of St. Clair County and some had made county-wide political campaigns for public office and were generally well known in the county. The Sheriff was exceedingly careful to select men of the general build, age, height, weight, hair color, and other general physical characteristics as those of appellant. The Sheriff was treading on dangerous grounds in selecting well-known public officials and private citizens to participate in a line-up and it is a practice that cannot be approved and must be judicially condemned. To stand an accused man in a line-up with widely known citizens and public officials just simply cannot pass constitutional muster. This practice is fraught with the danger of suggestiveness and could well lead to misidentification of a suspect. Human frailties being what they are, it would be too easy for the viewers of a line-up to quickly pass over well-known figures and focus on an unknown man. The susceptibility of error is too apparent for argument or further discussion.

As the District Attorney testified, each of the seven men in the line-up were requested to stand before a number, viz., 1, 2, 3, 4, 5, 6, and 7. Appellant was given his choice of the number he wanted to stand before and he freely chose Number 5. Each of the three witnesses who viewed the line-up, separate and apart from each other, wrote on a blank piece of paper the figure "5". After leaving the viewing room they were escorted by the Sheriff to another office in the courthouse and were not permitted to see and converse with the remaining witnesses awaiting their turn to view the seven men in the line-up.

 In this case, however, the three people who viewed this line-up testified unequivocally that they did not know or recognize anyone in the line-up except appellant. Each positively identified appellant as the man they saw at the Saine Creek bridge on the late afternoon of June 21, 1972, with the red flag and the highway construction type sign and who turned his head to the side as they slowly passed him. In addition, all three witnesses made a positive in-court identification of appellant.

Had these line-up witnesses testified they knew and recognized the five citizens

and public officials in the assembled line-up, we would unhesitatingly hold that the trial judge committed reversible error in overruling appellant's motion to suppress their testimony and reverse and remand the case for another trial. But in the light of their testimony, we hold the line-up *in this case* was not illegally constituted and there was no error in denying the motion to suppress.

Appellant did not testify but he offered his brother, sister-in-law, mother and stepfather as alibi witnesses as to where he was before and on June 21, 1972, the day of the homicide. They offered strong alibi testimony though in many respects their testimony was uncertain, mixed up and confusing. Appellant's sister-in-law, Mrs. Wesley Clark, gave the strongest testimony in his behalf, but her testimony was completely impeached and effectively destroyed on rebuttal by Mr. O. M. Reins, a criminal investigator of the State of Alabama, and the District Attorney.

It will serve no useful purpose to set out in detail the testimony of the alibi witnesses. Suffice it to say that these witnesses placed appellant at the home of his brother with whom he lived, and the home of his mother some two hundred feet away, at the time the state witnesses put him at or near the scene of the homicide. Mrs. Clark testified that appellant got home from work on June 21, 1972, around 4:30 or 5:00 P.M. and that he did not leave home again that afternoon or night; that after eating supper he played cards with her and her parents who were visiting her from Germany until bedtime.

In many instances the testimony of the alibi witnesses corroborated the state's evidence in material parts. They all agreed that appellant had two dark green work uniforms and always wore the type boots that were introduced in evidence and that was the way he was dressed on the day of the killing, and these were the same type uniform and boots the state witnesses said the man was wearing as they decribed him when they saw him at the Saine Creek bridge. They also admitted that on the occasion in question, appellant was the owner of a 1964 blue Dodge station wagon that some of the state's witnesses saw on the Saine-Margaret road just before or just after the body of the deceased was found in the red Bonneville automobile parked on the access road just north and to·the right of the bridge. Appellant's sister-in-law even testified that it was she who gave appellant the kleenex box that was found on the dash of his station wagon. She said that the kleenex box was blue and there was some family comment that the box matched the color of the station wagon.

On rebuttal the state investigator and the district attorney testified they had a conversation with Mrs. Wesley Clark on the night of July 6, 1972, behind the courthouse in Pell City. They asked her if she knew where appellant was on the night of June 21, 1972, and she replied that appellant told her he had gone to Odenville to see if he could get a couch fixed as he had dropped a cigarette on her couch and burned a hole in it. She further told them that appellant did not return home until sometime after eight o'clock and that they had waited supper on him and the food had gotten cold and she refused to fix supper for him that night. She said she remembered the date well as her mother and father were there and his brother got mad with him because he was not home in time to eat supper and her mother fixed his supper and sat at the table and ate supper with him. Mrs. Clark further told the state investigator and the district attorney that she did not know where appellant was on June 19, 1972, (the night of the ·alleged hit and run accident), as he had a habit of coming in awfully late; that one morning she got up earlier to fix breakfast and that appellant was just driving up at the break of daylight; that she got on him about this and he used the excuse that he had gone to get his girlfriend and spent the night with her in the camper, and he had gone to carry her home.

Appellant testified on the motion to suppress, out of the presence of the jury, and his counsel asked him if the district attorney advised him that he had a right to a lawyer at the line-up and if he was advised of his rights. He testified as follows:

"That was the first I saw of Mr. Robinson. I was introduced to him and Mr. Robinson advised me of my rights. He told me that they were going to have a lineup at the courthouse, and that I could have a lawyer present if I so desired; that I could not refuse the line-up, but I was to have counsel if it was my choice. And he told me that—said, 'You are charged with leaving the scene of an accident.' And he said, 'If you are put in the line-up, if anybody picks you out of the line-up, you will be charged in a woman's death. I told you I didn't need a lawyer.'"

On cross-examination appellant admitted he was convicted in 1955 of assault with intent to rob and sentenced to fifteen years in the penitentiary. He further admitted that he got out on parole and in 1961, while on parole, he was convicted of assault with intent to rape and assault with intent to murder and was sentenced to the penitentiary for twenty years in each case with both sentences to run concurrently.

Appellant was indicted on July 14, 1972, and counsel was appointed to represent him the next day. The trial date was set for September 21, 1972. On September 11, 1972, counsel filed a motion for a continuance to allow him time to take the testimony of two material witnesses living in Berlin, Germany, by deposition. Appellant's counsel propounded seven questions and the district attorney propounded forty-eight cross interrogatories. It was stipulated that the American Ambassador in Berlin was a suitable person to act as Commissioner to take the depositions of these two witnesses. The trial court ordered that all charges in connection with the taking of these depositions be paid by the State of Alabama. The case was continued on motion of appellant and counsel was advised that the case could not be reset before the January term, 1973, and it might be February before the case would be called for trial.

On January 10, 1973, appellant moved for another continuance alleging:

"That the depositions of Mr. and Mrs. Paul Tomkus of Berlin, Germany, have not, at this time, been obtained and probably will not be obtained by the next term of court, and said witnesses will not be available at the next term of court to personally testify on behalf of defendant. That the testimony of said witnesses are material to the defendant's cause."

The court overruled this second motion for a continuance and set the case for trial on February 5, 1973. The trial got under way on that date and continued from day to day until February 8th when the jury returned the verdict.

Appellant filed a motion for a new trial containing nine grounds. The motion was set for hearing and testimony of witnesses was taken. Prior to taking testimony on this motion counsel for apppellant made known to the court that he would not offer any testimony in support of grounds 1, 2, 3, 4, and 5. But as to ground 5, which deals with his second motion for a continuance because of the absence of the depositions of the witnesses in Berlin, Germany, counsel insisted that his client was denied due process in not granting his second motion. From the record:

"THE COURT: Well, just for the record, let me point out that this case was continued on September 11, 1972, solely because of the absence of Mr. and Mrs. Tomkus, who were then in Germany. As I understand it, their deposition has not been taken as yet."

It is interesting to note that the hearing on this motion was on March 1, 1973, and Mr. and Mrs. Tomkus arrived in Ashville, Alabama, the night before. The record is

entirely silent as to any explanation as to why they could not have been present on February 5, 1973, when the case went to trial.

Counsel made known to the court that grounds 6, 8 and 9 of the motion concerned points of law that were argued and ruled on during the trial and that he would have no further argument or testimony on those grounds.

That leaves ground 7 for consideration. Counsel claims that the jury was not properly and adequately protected from outside influences during the trial and before reaching their verdict in that the bailiff did not accompany the jury from Ashville to the Brothers-Four Motel in Pell City. It was on this ground that testimony was taken and heard by the trial judge.

Mr. Leonard Franklin, an ordained Baptist minister, of the town of Ashville, was appointed bailiff to attend the jury trying appellant. He was in charge of the jury during the entire time the trial was conducted during the day time in Ashville. He attended to their needs and accompanied them at meal times. There were no hotel or motel facilities in Ashville to accommodate a jury over night. The nearest such accommodations were in Pell City in the same county, and Mr. Franklin did not go with the jury to Pell City, and was not paid to do so. He testified that he could drive in the day time, but could not drive at night.

Mr. Mike Harvey, the Tax Assessor of St. Clair County, was appointed bailiff on the afternoon of the first day of appellant's trial. It was his duty to serve as night bailiff. Cars were provided to transport the jury to and from the motel in Pell City. Mr. Harvey drove his car and carried some members of the jury. Seven rooms were reserved at the motel. Two jurors were assigned to each of six rooms and Mr. Harvey occupied the seventh room next to the jurors. All seven rooms were adjacent to each other.

Mr. Harvey's father-in-law owned the motel but it was run or operated by Mr. Harvey's wife. The jurors were served their meals in a private diningroom with the bailiff present at each meal. They were completely sequestered or isolated from the outside world.

The only evidence even tending to show that the jury was ever separated from each other was on a few occasions when two or three jurors wanted to walk out of their rooms to smoke or chew tobacco and on these limited occasions the bailiff was continuously in their presence and he stayed with them until they returned to their rooms. The other jurors remained in their rooms during such times. On one occasion the wife of one of the jurors came to the motel to tell her husband the glad tidings of their son's appointment to West Point and this took place in the presence of the bailiff and that was all that was said. It would have been better had this news been imparted to the bailiff and relayed to the juror but certainly no one can legitimately claim that this occurrence prejudiced appellant's case in the slightest degree.

There were telephones in each room occupied by the jurors and also a television in each room and they were not disconnected. The telephones in these rooms could be used by dialing outside but all incoming calls had to come through the central switchboard. There was no evidence that any juror used a telephone to make an outside call nor that any juror received an incoming call. Neither was there any evidence that there was any news coverage on television respecting appellant's trial. To indulge the presumption that this sequestered jury received any information, message or news concerning appellant's trial would have to be based on the wildest kind of speculation. This we are unwilling to do.

Several of the jurors wanted newspapers to read before retiring for the night. The bailiff would not let these jurors have newspapers until he looked through them to

be sure there were no write-ups concerning the murder trial then in progress in Ashville, Alabama. It is difficult to image what more precautions could have been taken in a rural community to insure the integrity of a trial jury from outside influences.

The motion for a new trial was overruled and denied.

■ In reviewing the refusal of a motion for a new trial, this court will indulge every presumption in favor of the correctness of the ruling of the trial judge and the decision thereon rests largely within the discretion of the trial court. Heath v. State, 30 Ala.App. 416, 7 So.2d 579; Espey v. State, 270 Ala. 669, 120 So.2d 904; Page v. State, 41 Ala.App. 153, 130 So.2d 220; Moore v. State, Ala.App., 290 So.2d 246 (1974); Owens v. State, 40 Ala.App. 36, 109 So.2d 141.

There was no error in overruling the motion for a new trial.

■ Appellant urges a reversal of this case for the reason that the trial court denied his second motion for a continuance. The law is well settled that the question of granting or refusing a continuance rests largely within the sound discretion of the trial court and the exercise of such discretion is not reviewable on appeal except for gross abuse. We find no evidence of abuse of discretion in this case. Street v. State, 39 Ala.App. 190, 96 So.2d 680; Burleson v. State, 22 Ala.App. 526, 117 So. 500; Wyatt v. State, 35 Ala.App. 147, 46 So.2d 837.

■ Appellant bitterly complains that he was denied due process in being placed in a line-up without counsel. It is true that he did not have counsel at that time, but it is also true, as shown by his own testimony on the motion to suppress, that he told the district attorney that he did not want a lawyer. The record further reflects that the line-up was conducted prior to his indictment for murder. The law is clear that an accused is not entitled to counsel at a line-up prior to indictment. Sims v. State, 51 Ala.App. 183, 283 So.2d 635; Ratcliff v. State, 49 Ala.App. 77, 268 So.2d 858; Giles v. State, 52 Ala.App. 106, 289 So.2d 673; Kirby v. Illinois, 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411.

■ As pointed out, the state was compelled to rely on circumstantial evidence. Such evidence may afford satisfactory proof of the corpus delicti in a murder prosecution, and, if facts are presented from which the jury may reasonably infer the crime has been committed, the question must be submitted to the jury, and other evidence tending to implicate the defendant is thereby rendered admissible. Johnson v. State, 247 Ala. 271, 24 So.2d 17; Phillips v. State, 248 Ala. 510, 28 So.2d 542; DeSilvey v. State, 245 Ala.App. 163, 16 So.2d 183; McKee v. State, 33 Ala.App. 171, 31 So.2d 656.

This issue is best stated by the Supreme Court in Howard v. State, 108 Ala. 571, 18 So. 813, 815, wherein the court said:

"The facts and circumstances in evidence, if dissevered and disconnected, may be weak and inconclusive; but their probative force, when combined, as it was the province of the jury to combine them, under proper instructions from the court, may have satisfied them of the guilt of the defendant." .

■■ From the detailed delineation of the evidence it will be noted that appellant had the opportunity to commit the offense. He was positively identified at the line-up by three disinterested witnesses as the man they saw at the Saine Creek bridge at or near the time the deceased was killed. These witnesses described in detail how he was dressed even to the boots he had on. His 1964 blue Dodge station wagon was seen at the bridge and on the Saine-Margaret road shortly before or shortly after the homicide. Alibi evidence, like all other evidence, is for the jury's determination and the jury resolved that issue against appellant. The evidence of the boot track at

the automobile in which the body of the deceased was found was competent and relevant to rebut the alibi. McDowell v. State, 23 Ala.App. 197, 122 So. 703.

In Byrd v. State, 37 Ala.App. 121, 73 So.2d 376, Carr, P. J., writing for the court said:

"Stated generally, a person should not be convicted unless the evidence excludes to a moral certainty every reasonably hypothesis but that of his guilt. No matter how strong may be the circumstances they do not come up to the full measure of proof which is required by the law if they can be reasonably reconciled with the theory that the accused is innocent."

The above quoted legal principle was, in precise terms, embodied in the trial court's able charge to the jury and no exceptions were taken and reserved to any portion of the oral charge.

We think that the evidence presented a jury question and the court ruled correctly on all matters of instant review.

The judgment below is ordered affirmed.

Affirmed.

All the Judges concur.