HARRIS, Judge.
Appellant was convicted of burglary in the second degree and the Court sentenced him to ten years imprisonment in the penitentiary. He was represented throughout the trial proceedings by retained counsel. At arraignment he waived the reading of the indictment and pleaded not guilty. After sentence was imposed he gave notice of appeal and his bond was fixed at fifteen thousand dollars. He is free on bond pending this appeal.
There was no motion to exclude the State’s evidence; there was no request for the affirmative charge; and no exceptions were reserved to the oral charge of the court. After appellant’s conviction he employed new counsel to represent him and a motion for a new trial was filed. This motion raised the sufficiency of the evidence to convict appellant but no evidence was offered at the hearing and after argument the motion was overruled.
The State’s case was based entirely on circumstantial evidence. Appellant did not testify in his behalf.
The evidence adduced by the State tended to show that on the afternoon of June 21, 1976, the home of Captain Carl Vincent Garrett located in Blount County, Alabama, was broken into and seven guns, rifles and pistols - were stolen. The value of these weapons was fixed by the owner at $650.00. Also several pocketknives and three sets of knucks were taken at the same time. Captain Garrett was employed by the Birmingham Police Department. He and his wife were in Florida on vacation at the time of the burglary. Their daughter and small baby lived with them but were not at the house when the burglary occurred. She had a paper delivery route that afternoon.
The daughter, Carla Jean Garrett, testified that she knew appellant and saw him on June 21, 1976, about 12:30 p. m. driving on Highway 79, in a dark blue Mustang automobile. She stated that she and appellant were going in opposite directions and appellant waved at her. She was driving in the direction of Birmingham and appellant was driving in the direction of Locust Fort which was in the vicinity of her parents’ home. She further testified that she did not return home until around 4:30 o’clock that afternoon and she discovered that the front door to her parents’ trailer home had been broken in; that the locks were off. The metal around the lock was messed up and the wood casing near the lock appeared to have been damaged in forcing the door open; the door was partly open and she entered the trailer and found most of the rooms, closets and drawers open and things scattered all over the floor. She noticed that several guns were missing from two gun racks in the house. Her father’s personal papers and files were also scattered on the floor. She immediately called the Sheriff’s Department and reported the burglary.
Kenneth Tawbush testified that he lived about two miles south of Locust Fort on a dirt road off Highway 79 and about 300 to 400 feet from Captain Garrett’s trailer home. He further testified that around 12:30 p. m. on June 21, 1976, he saw appellant driving by his house in a dark colored small car and waved at him. That appellant continued on toward the driveway of the Garrett home. He said that about thirty minutes later he saw appellant and another man come out of the Garrett driveway on foot and each man was carrying long guns in his arms; that the men were walking in a westerly direction. He did not see the automobile appellant was driving leave the Garrett place as he had to leave *579 with his wife to go get groceries. He stated that in addition to the guns appellant was also carrying a sack or bag.
Tawbush further testified that a few months before the burglary of the Garrett home one Danny McCay was employed by him to help dig some field lines and that appellant came to where they were working and had a conversation with Danny McCay in his presence. He stated that Danny and appellant were related but he did not know the exact relationship. He said on this occasion appellant told Danny McCay that the Garrett house was a good place to hit, or would be an easy place to hit.
Hoyt Ronny Barnett, an officer with the Birmingham Police Department, testified that his patrol hours were from 1:00 p. m. until 11:00 p. m. and that he was on duty on June 23, 1976; that another officer asked him to examine and check out a blue Mustang automobile which was parked on the side of a public street in Birmingham. Officer Barnett found the blue Mustang parked where the other officer told him it would be. The windows to the car were down and the car was not locked and he saw some knives, knucks and a screwdriver between the bucket seats in plain view. The officer picked up the knives and knucks and wrote a note which he left in the car to notify the owner that he could come to the precinct station and pick up his property. A short time later appellant appeared at the precinct station and informed Officer Barnett that he was the owner of the blue Mustang and was there to pick up his property. Appellant told the officer the knives belonged to him but that he had never seen the knucks before in his whole life. The officer gave appellant the knives and he drove off in the Mustang.
Officer Barnett kept the knucks in his exclusive possession after putting his initials on them with an electric scriber until he turned them over to Aubrey H. Glas-scock, Deputy Sheriff of Blount County. At trial Officer Barnett identified his initials on the knucks. Captain Garrett identified the knucks as belonging to him and that they were one of the three sets of knucks he left in his home on June 21, 1976 when he left for a vacation in Florida. Captain Garrett was positive in his identification of the knucks by saying that “one of the posts on the knucks was broken” and that was the only one of the three sets that had a broken post.
Deputy Aubrey H. Glasscock of Blount County testified that he received a complaint that the Garrett house near Locust Fort had been burglarized on June 21,1976, and he went to this house that afternoon to conduct an investigation and he talked to Carla Garrett. He found the front door had been pried open and there were score or scratched marks on the striker plate. He stated the rooms in the house were ransacked and that clothes, papers and files were scattered all over the house. He found the gun racks empty. He talked to Captain Garrett by telephone the next night and got a better description of the missing guns and other items of personal property. He stated that Officer Barnett gave him the knucks the night following Barnett’s report of the Mustang automobile in Birmingham and he placed the knucks in his locked evidence locker. Glasscock further testified that he started looking for appellant in connection with this burglary and drove to his home on July 30, 1976. When he got to appellant’s home appellant was just driving in his driveway in a 1970 blue Mustang car. He arrested appellant for second degree burglary and gave him the Miranda rights and warnings. He transported him to jail and had another officer follow in appellant’s automobile. Glasscock saw a screwdriver with a chipped place on it lying in plain view between the bucket seats. He told appellant he wanted to take the screwdriver and appellant told him it was all right with him; that he could take it and keep it. After taking appellant to jail he again gave him the Miranda rights and warnings and appellant stated he understood his rights but he did not care to make a statement.
At the request of Captain Garrett and Deputy Glasscock Sergeant David Higgins of the Birmingham Police Department re *580 moved the striker plate from the door of Garrett’s home in the presence of Glasscock. He also got the screwdriver from Glasscock. He was requested to conduct a scientific examination of the striker plate and the chipped screwdriver to determine if this particular screwdriver was used to remove the striker plate.
Captain Garrett was recalled and he identified the striker plate and stated it was not scratched, scored and bent when he left home on Juné 21, 1976.
Sergeant Glasscock was recalled and testified that the striker plate was scored and bent when Sergeant Higgins removed it from the Garrett home in his presence.
The State qualified Sergeant Higgins as to his education, experience and background and his qualifications as an expert are most impressive. He testified as follows:
“A. The bulk of my training has been in the area of physical evidence and scientific investigations. The schools that I have attended while I have been a member of the Birmingham Police Department have been the Southern Police Institute, long-term three months school in Louisville, Kentucky, the University of Louisville, the FBI National Academy in Virginia. In addition, I have specialized training in finger-prints with the Federal Bureau of Investigation and in Washington D.C., various aspects on the forms or criminal investigations, a two-week seminar in Louisville, Kentucky. I also have been to the Southern Police Institute again. I have been to identicate (sic) schools, explosive ordinance, various target seminars, and I have taught in colleges and universities in Birmingham in the area of physical evidence. And in addition, I have taken college courses, in particular, chemistry courses, mathematics, physics and others that relate to the analysis of physical evidence. During my period I have. also trained under people such as Mr. Robert Johnson, formerly of the State Department of Toxicology and Criminal Investigations, who has been accepted in giving testimony in courts throughout the northern portion of the state. Also, I have worked with Mr. Lawden Yates, who is currently with the Department of Toxicology and in this particular area of examinations of tool marks and firearms which are related. I have today documented a hundred and fifty cases that I have independently examined.
* * * * * *
“No, sir, not metallurgy. The science or comparison or what is commonly known as the ballistics. Ballistics is nothing more than a special case of tool marks. Tool marks is what pertains to this case. It is the physical matching of impressions transferred from surface to another surface. An example would be the striking of a metallic plate by a hammer, the passing of a projectile through the barrel of a gun, or a prizing action or a pinch action of a crowbar or screwdriver or similar device enforcing a metal or whatever away from another object, or in the case of cutters, wirecutters. It is possible in each of these instances that the two acting upon the other surface involved will leave a distinctive mark, and these marks are what I identify.
sfc # sfc #
“In an attempt to duplicate the action, I studied the marks on the doorjamb and in the laboratory I took the screwdriver and looked at the striker plate under the microscope, and I took a piece of lead or softer material, softer than the screwdriver, and a little bit softer than the striker plate material, but somewhat the same, I held the piece of lead in a position, and I tried.-to on two separate occasions to duplicate the angle and the action that appeared to have occurred with this particular striker plate, or could have occurred with this particular striker plate if this were in fact the tool. I made test marks and then completed the test marks. This piece of material or lead was placed under one side of a comparison microscope while this was placed on the other side. Now, a'comparison microscope is a device that allows you to use two fields at once *581 and is split in the middle. For example, if we were going to look at our fingers under the microscope, we would line both of them up like this. (Indicating.) The line would cut one finger here and pick up the other finger here so it can run things up right side-by-side. And this thing was scratched, and when this happened, it left some characteristic marks. In this case, I found that this tool did in fact leave some characteristic marks. So, on duplicating the approximate angle I believed the tool was used at, I transferred it to this piece of lead. And physically comparing the little marks or striations, which are not unlike the marks that you see in margarine if you cut margarine with a serrated table knife, it will leave marks there because the knife is hard and the margarine is soft. The same thing is true here, this is hard and this is soft.

“On making the marks and comparisons, I found an area that matched the marks or striations that were left in the striker plate. And it is my opinion that this tool which made the known marks where I have marked K2 in my laboratory is the same tool, in fact, that made the mark on the back of that striker plate.”
He summed up his testimony by rendering an opinion that based upon the scientific study and examination of the striker plate and the screwdriver that the score marks on the striker plate were made by the particular screwdriver that was found in appellant’s car.
The knucks, screwdriver, and striker plate were admitted into evidence over appellant’s objections.
Rosco McCay testified that he drank often with Kenneth Tawbush and that on one occasion Kenneth told him that for a price he could get appellant off, but on cross-examination he stated this was just drinking talk and that Kenneth didn’t actually make him a proposition.
Roland McCay, appellant’s father, testified that the screwdriver in question belonged to him and that he brought it home about a week after the burglary. On cross-examination he testified that he didn’t know that a burglary had been committed until his son was arrested on July 30, 1976. He admitted that appellant owned a 1970 blue Mustang automobile.
As we have said the State was compelled to rely on circumstantial evidence to convict appellant. Circumstantial evidence is entitled to the same weight that direct evidence is entitled to provided it points to the guilt of the accused. In cases where the State relies on circumstantial evidence for a conviction, very wide latitude is allowed in making proof. Cline v. State, 25 Ala.App. 433, 148 So. 172; Willis v. State, 37 Ala.App. 185, 66 So.2d 753; Sumeral v. State, 39 Ala.App. 638, 106 So.2d 270.
The web of circumstances which enshrouds appellant includes the following: (1) He was seen driving a blue Mustang car toward the driveway of the trailer house that was broken into on the afternoon of June 21, 1976. (2) Thirty minutes later he was seen with an armful of guns walking away from the place of the burglary. (3) A pair of knucks identified as belonging to the owner of the burglarized house was found in his automobile in plain view. (4) A screwdriver was removed from his car with his permission which turned out to be the instrument used to force entry into the house. (5) This screwdriver, according to an expert’s opinion, made the scored marks on the striker plate that was on the trailer house door where the burglary occurred. (6) Appellant’s own father said his son owned a blue Mustang automobile. (7) At the time he was arrested he drove into his driveway in a 1970 blue Mustang.
Where there is a reasonable inference to prove the existence of the corpus delicti, the Court should submit to the jury for its consideration the question of the sufficiency and weight of the evidence tending to support that inference. Hines v. State, 260 Ala. 668, 72 So.2d 296; Creel v. State, 53 Ala.App. 504, 301 So.2d 267.
*582 In reviewing the refusal of a motion for a new trial this Court will indulge every presumption in favor of the correctness of the ruling of the trial court as the decision thereon rests largely within the discretion of the trial judge. Clark v. State, 54 Ala. App. 217, 307 So.2d 28; Espey v. State, 270 Ala. 669, 120 So.2d 904; Nichols v. State, 267 Ala. 217, 100 So.2d 750.
We have carefully searched the record for errors affecting the substantial rights of appellant and have found none.
The judgment of conviction is affirmed.
AFFIRMED.
All the Judges concur.