283 So.2d 635

**James SIMS**

v.

**STATE.**

**6 Div. 312.**

Court of Criminal Appeals of Alabama.

Sept. 25, 1973.

Richard A. Thompson, Tuscaloosa, for appellant.

William J. Baxley, Atty. Gen., and Robert S. Lamar, Jr., Sp. Asst. Atty. Gen., for the State.

DeCARLO, Judge.

This appeal is from a judgment of the Circuit Court of Tuscaloosa County adjudging appellant guilty of murder in the first degree and sentencing him to death by electrocution.

Details of the murder were presented by the State through the testimony of Michael Jones, a fourteen-year-old eyewitness. He was spending the night of April 4, 1969, with his grandmother, Mrs. Carrie Jones, and during the early morning hours they were both awakened by a noise at her window. Upon entering her bedroom, he could see the outline of someone at the window. At that time, Mrs. Jones took a .22 pistol from her dresser. They noticed the figure disappear, and subsequently heard a noise at the back door. The door, which had been locked, was kicked open, and when Michael ran into the kitchen, he saw a tall black man standing there. The intruder was told to get out, but he started waving a knife and backed young Michael into his bedroom. As the stranger proceeded into the grandmother's room, she shot at him. He then pushed her onto the bed and during the ensuing struggle, she fired again. The assailant then fled through the boy's bedroom and out the back door. The witness ran across the street to get his father, and the police were notified.

State Toxicologist Robert Johnson testified that Carrie Jones died of a puncture wound close to the heart which was inflicted by a sharp instrument, probably a knife. He made a ballistics test on a RG 10 pistol found under the bathtub in appellant's residence and a .22 caliber bullet taken from the ceiling of deceased's bedroom. As a result, it was his opinion the bullet had been fired from that pistol.

About 10:00 o'clock on Saturday morning, April 5, Detective Dempsey Marcum, along with two other officers, went to the home of James Sims, appellant. Observing appellant rubbing his neck, Detective Marcum asked if he had any trouble the previous night or if he had been in a fight. Sims replied he had been with some boys and denied being in a fight. Appellant further stated something had stung him. On this occasion, Capt. Robert Moore, State Criminal Investigator, asked appellant if he would mind going to the Police Department and talking with them. Sims stated he would be glad to. Capt. Moore also asked if he would mind some people looking at him, and accused replied no, he would not.

Upon arrival at the police station, the officers received a call and had to leave. Within twenty minutes they radioed headquarters to have appellant taken home.

On the Sunday following, Capt. Moore, and Detectives Cottingham and Jones went to appellant's home at 10:00 A.M. Although Sims was home, the officers made no effort to talk with him. Appellant was not there when they returned around 2:00 P.M., but they talked with his mother generally as to the occupants of the house. Other visits were made at 3:30 or 4:00 that same afternoon, and finally about 5:00 P.M., they located appellant at home. Later, when Sims was standing near their car, Detective Jones asked him what caused the place on his jaw. Again appellant replied that a bee either stung or bit him. At this time Captain Moore felt of the area, and in his testimony described it as a small, round hole with a kind of scab around the edge.

After arriving at the detectives' office, appellant was informed that Carrie B. Jones was dead; that appellant was a suspect; and that before talking with him, they wanted to advise him of his rights. Capt. Moore also stated he would like to get Sims' neck x-rayed and would like to have some people look at appellant. Testimony reveals the following conversation took place at this point:

"Q. All right, let me ask you this: After you had left the, after you had left the police station to go to the hospital, was counsel mentioned again?

"A. It was.

"Q. When and where?

"A. Before we left the police department I asked James if he would like for me to call him an attorney to go with us to have his neck x-rayed and also for a lineup.

"Q. What did he say?

"A. He said he didn't need one for that.

"MR. THOMPSON: (Defense Attorney) Didn't need one for what?

"A. To go have his neck x-rayed and to have a lineup."

The x-rays made at Druid City Hospital by Dr. Joe Davis revealed a metallic object about ¼" underneath the skin in the back of appellant's neck. Dr. Davis did not know how long the metallic object had been there; it could have been anywhere from one to four days.

After leaving the hospital, they arrived at the County Jail about 7:30 P.M. Within a short time, the lineup was held, at which Michael Jones identified appellant as being the attacker. The following testimony by Capt. Moore sets out his subsequent conversation with Sims:

"Q. After the lineup was over, did you inform the Defendant of the results of the lineup?

"A. I did.

"Q. And was anything said then about counsel?

"A. I went in to where James was sitting at that time and I said, 'James, you have been identified. Now will you let me call you a lawyer?'

"Q. What did he say?

"A. He said, 'Yes, call Scott Atkins.'

"Q. And was Scott Atkins called?

"A. He was.

"Q. Did he come down?

"A. He did."

I

Appellant insists that the court erred in denying his motion to exclude the testimony of Michael Jones on the grounds that the pretrial confrontation was suggestive and unfair and constituted a violation of due process of law. United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L. Ed.2d 1149; Gilbert v. California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178. It is further urged that the lineup was illegal as appellant did not have counsel present and no proof of any waiver of such right was shown.

James Sims was exhibited to Michael Jones before trial and prior to any formal charges being lodged against appellant. According to the following testimony of Capt. Moore, appellant was advised of his constitutional rights on Sunday afternoon prior to the lineup at 8:00 P.M.

"Q. What did you tell him with regard to the death of Mrs. Carrie B. Jones?

"A. James sat down across the table in front of me and I told him that he was a suspect in the incident that happened to Mrs. Jones and before I talked to him I wanted to advise him of his rights, explain them to him.

"Q. Okay, and did you use any form or any written matter in telling him of his rights?

"A. I did later.

"Q. As you understood his rights to be?

"A. I did later.

"Q. All right, at that moment did you tell him what his rights were?

"A. I did.

"Q. Did you do that out of your head?

"A. I did.

"Q. And at this time did he make any statement? What generally did

you tell him, or as best you can, what did you tell him out of your own mouth that his rights were?

"A. I told him to start with that the main thing I wanted to get across to him, in the first place he did not have to talk to us at all, he did not have to answer any questions, that he did have a right to, if he did want to answer questions he did have a right to an attorney, or I believe I said lawyer, there with him at the time, and that if he did not have the money for a lawyer one would be appointed for him at no cost to him; that anything he did tell us would and could and would be used in court against him; and the main thing I wanted him to understand, he didn't have to talk to us.

\*       \*       \*       \*       \*       \*

"Q. All right, how much later was it then, if you have a judgment, from the time you told him his rights from your head until the time when you did it from some printed matter?

"A. As soon as I got through telling him that I picked up the printed form we have.

"Q. Then are you saying you didn't get or request any retort from him, any response from him; is that right?

"A. Not to my recollection.

"Q. Then you say you came with a printed form?

"A. Yes.

"Q. Is this something furnished to you by the Department?

"A. It is.

"Q. All right, then what did you do with the printed form?

"A. This is a Waiver of Counsel form that we use. Primarily it was fixed up for people in custody but

we use it on any such suspect. You use that because it is written out and has a place for them to sign to show they have been given their rights.

\*       \*       \*       \*       \*       \*

"Q. All right; now, then, what did you do with this printed form you had?

"A. I read it to him.

"Q. Okay; then what did you do with it?

"A. After I read it to him I asked him if he could read and write and he said he could and I then handed him the form and let him read it.

"Q. Okay.

"A. I then asked him if he would sign the form. He said, 'I will talk to you but I will not sign the form.'

\*       \*       \*       \*       \*       \*

"Q. You said you have told him he has a right to a lawyer. Now, did you offer to get him a lawyer?

"A. I did.

"Q. All right, what did you say to him? What form did your offer take?

"A. I asked him if he wanted me to call him a lawyer and he said he had his own lawyer that he paid by the week or by the month—I'm not sure which.

"Q. Did you offer to call him?

"A. I did.

"Q. Okay, all right; now, I believe you said he said he would talk to you but he would not sign anything?

"A. That is correct.

"Q. Did he give you a reason why he would talk to you but would not sign anything?

"A. He said his lawyer told him not to ever sign anything unless he was there."

It was following this conversation that Capt. Moore asked appellant if he wanted a lawyer for the x-rays and lineup, and appellant replied, ". . . he didn't need one for that."

■ Police station showups conducted after arrest, but before indictment or other formal charges is not a "criminal prosecution" at which accused has a constitutional right to counsel. Kirby v. Illinois, 406 U. S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411. In *Kirby,* supra, the court declined to impose the "exclusionary rule" upon testimony concerning identification that took place before the commencement of any prosecution.

In the instant case, the appellant was not arrested and charged until after the lineup. This fact is shown by the following testimony of Capt. Moore on the pretrial motions:

"Q. At what point, at what point did you finally actually, you might say, charge him with the murder?

"A. That was at approximately 9:00 P. M. on the night of the 6th.

"Q. In terms of the events which had most recently transpired before you made that accusation, what had just happened? What part of your investigation had just terminated?

"A. Before he was charged?

"Q. Yes. I am talking about before you actually, not necessarily put a warrant on him but at such time as you did something to amount to an accusation. There has been testimony about various things that were done, that he had been talked with from time to time; that he made a trip to the hospital for a purpose; and that there was something about a lineup; and at some place the man was finally formally accused of being guilty of the murder of Mrs. Carrie B. Jones. Where in the sequence of these events did you reach a point of accusing him of the murder?

"A. After the lineup."

■ Appellant asserts that the pretrial identification by Michael Jones was tainted because of the following conversation overheard prior to the viewing:

"Q. While you were there waiting for the lineup did someone make a telephone call in your presence?

"A. Yes, sir.

"Q. Would you tell the jury who made the telepone call in your presence?

"A. I think it was Mr. Marcum.

"Q. And what did Mr. Marcum say over the telepone in your presence?

"A. He told someone to get some colored men lined up for a lineup and told them about certain height or certain weight or something and he said something about he had another one coming, to just get four or five, that they had one at the hospital getting an x-ray, that they were going to bring him to put him in the lineup.

"Q. Had someone at the hospital. Did he say anything about x-rays?

"A. Yes, sir.

"Q. Someone at the hospital who was having an x-ray?

"A. Yes, sir.

"Q. Of the neck?

"A. Yes, sir.

"Q. Someone at the hospital being x-rayed of his neck?

"A. Yes, sir.

"Q. And that person would be in the lineup?

"A. Yes, sir."

The content of this testimony, in our judgment, did not taint the identification by Michael Jones. It in no way identified, described, pointed to or directed attention to the individual mentioned in the telephone conversation or to the appellant.

As to the actual identification, Capt. Moore made this statement:

"As the subjects were being marched into the lineup area Mike turned to us and said, 'Capt. Moore, I don't care how many you have me look at, that is him,' and pointed to James."

The five participants in the lineup were about the same size and similarly dressed. At no time during the viewing were they asked to step forward, turn to profile, or do anything that would indicate one of the group had been to the hospital. Coupled with these facts, the conversation overheard by Michael Jones does not render the lineup so unnecessarily suggestive and conducive to irreparable mistaken identification as to constitute a denial of due process. Evidence shows that the accused was face-to-face with the identifying witness under a kitchen light just two days prior to the lineup, and it clearly appears from the young man's testimony that he had a vivid recollection of the assailant.

We therefore, conclude that the conduct of the lineup, when viewed under the totality of the circumstances, did not constitute a denial of due process of law.

## II

■ Appellant argues that the refusal of the trial court to permit defense counsel to examine a critical witness on voir dire constituted reversible error.

" 'Voir dire' as defined by Black's Law Dictionary, 4th ed., means to 'speak the truth'; 'This phrase denotes the preliminary examination which the court may make of one presented as a witness or juror, where his competency, interest, etc., is objected to.' " Burke v. State, 44 Ala.App. 379, 209 So.2d 859.

This precise question was dealt with in State v. Wilbanks, 289 Ala. 166, 266 So.2d 619, wherein the Supreme Court of Alabama stated:

"We have found no decision of this court or the Court of Appeals wherein it has been held reversible error for the trial court to refuse to permit the interruption of the examination of a witness on direct to permit counsel for the defendant to examine the witness on 'voir dire.' "

## III

■ It is further contended that the trial court erred when it allowed the prosecution to use appellant's statements concerning his neck. Defense counsel asserts that these statements stemmed from a custodial interrogation where the appellant was not apprised of his constitutional rights.

In Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, the Supreme Court of the United States set out the definition of custodial interrogation:

"By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."

James Sims was not under arrest when the statements concerning his neck were made. His freedom of action was not impaired in any significant way. One statement was made in the confines of his home, and the other in the front yard a few feet from his front porch. Miranda does not apply to statements made under such circumstances.

". . . [W]hen the process shifts from investigatory to accusatory—when its focus is on the accused and its purpose is to elicit a confession—our adver-

sary system begins to operate, and, under the circumstances here, the accused must be permitted to consult with his lawyer." Escobedo v. Illinois, 378 U.S. 478, 84 S. Ct. 1758, 12 L.Ed.2d 977.

■ It is equally plain that "focus" alone does not trigger the necessity for *Miranda* safeguards. In the absence of actual arrest something must be said or done by the authorities, either in their manner of approach or in the tone or extent of their questioning. One thing that is undeniable in the *Miranda* decision is that focus means custody, not that custody means focus. United States v. Hall, 2 Cir., 421 F.2d 540.

The amount of information possessed by the police was not sufficient to concentrate their attention on Sims. Only after the identification by witness Jones could it be said the investigation focused on the appellant. Hence, it is evident that the statements were non-custodial and not violative of the appellant's constitutional rights against self-incrimination.

### IV

■ Appellant insists that the trial court erred in admitting into evidence the deceased's pistol which was seized during the search of Sims' home. Defense counsel further argues that this search, although conducted under a warrant, was tainted by "possible" or "probable" prior exploratory searches of the house without a warrant.

A motion to suppress raised the very grounds complained of, but after a full hearing the motion was denied. The fact of exploratory searches having been made was not established due to the obvious conflict in testimony. Each officer testified no search occurred prior to the one conducted pursuant to the search warrant.

The pistol was found on Monday morning when the search warrant was executed, and no testimony existed indicating observation of the weapon before that date.

After a careful consideration of all the testimony on this issue, we are of the opinion that the warrant search was valid.

### V

■ Appellant next contends that the court committed error in failing to declare a mistrial when the District Attorney commented in closing argument:

"I won't say he had to defend himself by having an operation to take the bullet out of his neck."

This court stated in Braden v. State, 49 Ala.App. 97, 268 So.2d 877:

"The general rule governing permissible argument is that an attorney cannot be allowed to state anything as a fact which is unsupported by evidence. Olden v. State, 176 Ala. 6, 58 So. 307.

"Counsel is permitted to comment or draw inferences on facts in evidence. It is only when these facts are unsupported by the evidence that the rule is violated."

We are of the opinion that the solicitor's remark in closing argument was merely an expression of opinion and based on his conception of the evidence. It was not the type of comment that would constitute reversible error.

### VI

■ We have read the entire record consisting of 696 pages and cannot agree that the trial court erred when it would not apply the so-called "Luck Doctrine." This would have enabled the appellant to testify and not be subjected to cross-examination of his crimes involving moral turpitude. The doctrine has not been applied in Alabama, and the general rule still prevails that once an accused takes the stand, he may be cross-examined concerning any crimes he has committed involving moral turpitude.

### VII

■ At this point in time, the death penalty cannot be carried out. Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L. Ed.2d 346. Guided by our Supreme Court

in Swain v. Alabama, 290 Ala. 123, 274 So.2d 305, and related cases, the sentence of death imposed upon appellant is vacated and set aside. The sentence is corrected to provide that James Sims be imprisoned in the State Penitentiary for the term of his natural life. The clerk of this Court shall furnish a certified copy of this order to the Clerk of the Circuit Court of Tuscaloosa County, and the Clerk of that Court shall issue a commitment in this case based upon this sentence of life imprisonment and shall forward the commitment to the Board of Corrections.

Except as to the death sentence, the judgment of the Circuit Court is affirmed. As to the death sentence, the judgment of the Circuit Court is modified and the sentence is hereby reduced to life imprisonment, and as so modified, the judgment is affirmed.

Modified and affirmed.

All Judges concur.