The appellant, Glenn Smith, was charged with possessing pethidine contrary to the provisions of the Alabama Controlled Substances Act. The trial was held before a jury and the appellant was found guilty. After judgment was pronounced, he was sentenced to five years imprisonment. It was from this judgment that he appealed.
In this appeal he seeks reversal on three grounds:
1. That the affidavit supporting the search warrant contained misrepresentations or erroneous statements of the informant which were material to the establishment of probable cause.
2. That the State failed to prove that the appellant was in constructive possession of contraband and had knowledge of its presence.
3. That it was error to admit for the jury's consideration unidentified capsules, tablets and pills, which were similar in appearance to the items charged in the indictment and alleged to be in the possession of the appellant.
On December 21, 1975, Sgt. Smelley of the Alabama Bureau of Investigation, a division of the Alabama Department of Public Safety, received information by telephone from a reliable informant who said that approximately 7:00 P.M., he had purchased three hits of demerol from the appellant. About thirty minutes later, Officer Smelley met the informant, Ellie Fleming Martin, III, at Wilson Dam and was told that he, Martin, had purchased narcotics from the appellant, Glenn Smith, and at the same time had observed other narcotics in Smith's possession. Martin informed Smelley that the drugs "were kept in a shoe box located under the bed in the first bedroom on the left as you started down the hall." Based on this information, Officer Smelley made the following affidavit in support of his application for a search warrant:
. . . . .
 "My name is Lawrence D. Smelley. I have been a Trooper for the Alabama Department of Public Safety for 15 years, and I am now assigned to the Alabama Bureau of Investigation, a division of the Alabama Department of Public Safety.
 "Within the past 5 days, I have received information from a reliable informant that Glenn Smith is selling Amphetamines, Barbiturates, and Narcotics, and has in his possession in his home in Colbert County, Alabama, Amphetamines, Barbiturates, and Narcotics. On December 21, 1975, I received information from a reliable informant who is known to me to be truthful and reliable and who has given me information in the past which has resulted in arrests and convictions of drug violators. My informant has purchased Amphetamines, Barbiturates, and Narcotics from Glenn Smith at Glenn Smith's home in Colbert County, Alabama within the past 72 hours. He observed, at the time of this purchase, additional Amphetamines, Barbiturates, and Narcotics in the residence of Glenn Smith while the said Glenn Smith was present. *Page 670 
 "Therefore, I am requesting a search warrant for the home of Glenn Smith, whose name is to the affiant otherwise unknown, than as stated, and other John Does whose names are otherwise unknown to me at this time, which is located in Colbert County, Alabama by the following: Beginning at the intersection of U.S. 43 72 in Colbert County, travel South on U.S. 43 for 6.2 miles. Then turn left on a Colbert County paved road # 78, known as Vandiver Hollow Road and travel for 1.8 miles. Then turn left of a Colbert County paved road # 77, known as Coburn Mountain Road and travel for .6 of a mile and it is a red shingled house with a gray asbesto [sic] shingle roof next to a tan and white house trailer, both located on the left side of the road."
The search warrant was issued on December 22, 1975, and approximately 3:00 P.M. that day, Sgt. Smelley with a team of officers served it. The premises described in the warrant were alleged to be the residence of the appellant and at the time the officers arrived he was standing in the front yard talking with a neighbor, Casey Skidmore. Also present at the time was Smith's wife, two of his daughters, and his son, Lanny Smith, who arrived some minutes later. The search of the house revealed approximately 956 pills in a shoe box underneath the bed of the bedroom on the left as one started down the hall. The drugs, which were the subject of this prosecution, were found in a bottle in a dresser drawer in that room. Three more bottles of pills were found in a Pontiac automobile registered to the appellant's son, Lanny Smith. All the drugs were not identified, only those found in the dresser drawer were analyzed and found to contain pethidine, which is "also known as merperidine" of which "Demerol is the brand name."
 I
On May 10, 1976, a jury was selected but prior to presenting any evidence to the jury, a hearing was held out of their presence on appellant's motion to suppress. Counsel for appellant at trial requested that he be permitted to add to his written motion to suppress, a new ground, Number 20. Permission granted by the court and appellant was allowed to add the following ground:
 "For that information alleged to be from an informant, the basis of this search warrant, was heresay [sic], in that the informant stated to the affiant that he he [sic] did not personally observe the drugs on the premises of the Defendant, but that the informer heard from another person, who allegedly personally observed the drugs, and that there is a failure in the warrant to prove the first informant was a reliable person."
During the suppression hearing when Ellie Martin, the informant, was being questioned by the appellant's attorney the following occurred:
. . . . .
 "Q. O.K., now, on December 21 when you talked to Mr. Smelley, would you tell the Court whether or not you told him that you had purchased amphetamines, barbiturates and narcotics from Glenn Smith at Glenn Smith's home in Colbert County, Alabama, within the past seventy-two hours?
"A. No, sir.
 "Q. Did you tell him that you observed at the time of this purchase additional amphetamines, barbiturates, and narcotics in the residence of Glenn Smith, while the said Glenn Smith was present?
"A. No, sir.
 "Q. O.K. I'll ask you did you tell Mr. Smelley that another person known to you was a person who had observed and had purchased amphetamines, barbiturates and narcotics from Glenn Smith's home in Colbert County, Alabama?
"A. Yes, sir.
 "Q. O.K. Did you at any time tell Sergeant Smelley that you had been on the premises of Glenn Smith and had purchased such narcotics, amphetamines and barbiturates?
"A. No.
 "Q. But did you tell him that your information came from another person? *Page 671 
"A. Yes, sir.
"Q. And did he know who this person was?
"A. Yes, sir.
"Q. Did — and was this person, Teresa McCorkle?
"A. Yes, sir.
 "Q. At any time, did Sergeant Smelley talk to Teresa McCorkle concerning this matter?
"A. No, sir, not that I know of.
"BY THE COURT: Cross examination.
"CROSS EXAMINATION BY MR. PATTON:
 "Q. Mr. Martin, have you ever given information in the past concerning anybody that had drugs?
"A. Sir?
 "Q. Have you ever given information any law enforcement officers in the past about people having drugs?
"A. You mean for this?
"Q. Yes, sir.
"A. Yes, sir.
. . . . .
"RE-DIRECT EXAMINATION BY MR. HUNT:
 "Q. Did you ever tell Officer Smelley that you had observed Glenn Smith selling amphetamines or in the possession of amphetamines?
"A. No, sir.
 "Q. Did you ever tell Sergeant Smelley that you had ever purchased amphetamines from him yourself?
"A. No, sir.
 "Q. And did you make it clear to him on the night of December 21st and at any other time you talked to him within five days before December 21st, that you had not observed or you had not purchased, but that someone else had told you that?
"A. Yes, sir, he knew it was someone else.
"Q. And did you tell him that person's name?
"A. Yes, sir."
Following Martin's testimony during the suppression hearing, Lawrence D. Smelley was called as witness on behalf of defendant and the following occurred:
. . . . .
 "Q. . . . [D]id you obtain a search warrant from the Colbert County Court on December 22, 1975, to search the premises of Glenn Smith?
"A. Yes, Sir.
 "Q. Now, you alleged in the affidavit, the basis of this warrant, that within five days I have received information from a reliable informant that Glenn Smith is selling amphetamines, barbiturates and narcotics, and has in his possession in his home in Colbert County, Alabama, amphetamines, barbiturates and narcotics. On December 21, 1975, I received information from a reliable informant who is known to me to be a truthful and reliable and who has given me information in the past which has resulted in arrests and convictions of drug violators. My informant has purchased amphetamines, barbiturates and narcotics from Glenn Smith at Glenn Smith's home in Colbert County, Alabama within the past seventy-two hours. He observed, at the time of this purchase, additional amphetamines, barbiturates and narcotics in the residence of Glenn Smith while the said Glenn Smith was present. Now, you have heard the testimony of Ellie Martin, III, who said that he met you at Wilson Dam on the night of December 21 and gave you some information concerning Glenn Smith, and I ask you if he is one and the same person as the informant alleged in this affidavit?
"A. Yes, sir.
. . . . .
 "Q. And did Ellie Martin make known to you at that time that he had not personally purchased the narcotics or whatever he alleged to have purchased, but that Teresa McCorkle had done so?
"A. On the night of the 21st?
"Q. Yes.
"A. No, sir, he said that he had purchased.
"Q. Said he did not?
"A. Said he did. *Page 672 
"Q. He said he purchased?
"A. Yes, sir.
. . . . .
 "Q. So, at that time, you say the informant told you that he had purchased those amphetamines?
"A. Yes, sir.
 "Q. And he told you at that time that he had seen other drugs present?
"A. Yes, sir.
 "Q. What did he tell you was Teresa McCorkle's role in this business?
 "A. Teresa originally had the in with Mr. Smith. At first, according to Mr. Martin's testimony, now what Mr. Martin was telling me Mr. Hunt. I have no firsthand knowledge of what actually went on. According to what he told me, that begin with the only person Mr. Smith would allow to buy from him was Miss McCorkle. We asked him to attempt to arrange so he could buy it himself, which is the hold up, I mean this is why the time passed from December 7 to December 22 when we got the search warrant. And he called Mr. Sanderson that night. They had had a previous discussion earlier in that day, what the content of that was, I do not know. Mr. Sanderson called me and told me that he would call that night at Mr. Sanderson's residence at approximately 7:00 P.M., if he had been successful in getting his way in to purchase from Mr. Smith. He called at approximately 7:00 P.M., stated that he had bought three hits of Demerol.
 "MR. HUNT: Just a minute — did he state that to you or somebody else?
 "A. He made it to me and Mr. Sanderson, because he talked to Mr. Sanderson on the phone first and then Dickie handed the phone to me. Mr. Sanderson was sick at the time, I believe, with the flu.
. . . . .
"CROSS EXAMINATION BY MR. PATTON:
 "Q. Mr. Smelley, did Mr. Martin give you any information as to the location of the drugs, where they would be found in the house?
"A. Yes, sir, he did.
"Q. What was that information Mr. Smelley?
 "A. He told me they were kept — most of them were kept in a shoe box located under the bed in the first bedroom on the left as you started down the hall.
 "Q. Did that information also prove to be reliable Mr. Smelley?
"A. Went right straight to it sir.
 "Q. And did he, at the time when he gave you all this information on December 21, state to you that he had made the purchase?
"A. Yes, sir.
"Q. And that Mr. Smith was present?
"A. Yes, sir.
"Q. And that he saw — he observed other drugs there?
"A. Said there was a shoe box full.
 "Q. And you did find that shoe box as a result of the search?
 "A. We found a box that appeared to be similar to a shoe box, whether it was a shoe box or not I don't know but it was full of amphetamines, barbiturates.
"Q. Where was it located?
 "A. Under the bed in the first bedroom on your left as you start down the hall in Mr. Smith's house."
Teresa McCorkle was called as a witness for the defendant and she testified in part as follows:
 "Q. Now, I'll ask you if on December 21, 1975, you went to Glenn Smith's home in Colbert County, Alabama?
"A. Yes, sir.
 "Q. Now, I'll ask you if at that time Ellie Martin, III was present in the automobile with you?
"A. Not when I went to the house.
 "Q. O.K., now, was he in the automobile with you when you went near Glenn Smith's house?
"A. Yes, sir.
 "Q. And how close did he get to Glenn Smith's house? Ellie Martin that is.
"A. Maybe a mile.
"Q. About a mile away. *Page 673 
"A. I guess so.
 "Q. Did Ellie Martin, III, at any time during that day go into the home of Glenn Smith?
"A. No, sir.
"Q. Did he talk to or get nearby Glenn Smith?
"A. No, sir.
 "Q. And did you later tell Ellie Martin, III, that you, yourself, had observed some illegal drugs in Glenn Smith's house?
"A. Yes, sir.
 "Q. And was your statement to Ellie Martin, III, that you, yourself had observed those drugs, that you — that Ellie Martin, III, had not been on the premises and personally observed them?
"A. No, sir, he didn't.
 "MR. HUNT CONTINUES: O.K., now, have you ever given information to Alabama State Trooper Sergeant Lawrence D. Smelley the gentleman seated at the counsel table?
"A. No, sir.
 "Q. Wait a minute, let me finish. Have you given any information to him concerning the purchase or observation of any amphetamines, barbiturates and narcotics in the residence of Glenn Smith?
"A. No, I haven't.
 "Q. And have you ever talked to State Trooper Sergeant Smelley concerning any transaction with Glenn Smith at all?
"A. No, sir.
. . . . .
"CROSS EXAMINATION BY MR. PATTON:
. . . . .
 "MR. PATTON CONTINUES: Did you on the occasion on December 21, in fact, go to the home of Glenn Smith, located in Spring Valley and purchase some Demerol?
"A. I'm not sure if it was Demerol.
"Q. Did you buy some drugs there?
"A. Yes, sir.
. . . . .
 "Q. And did you on this occasion see other drugs located there in the home of Glenn Smith?
"A. No, sir.
"Q. You did not?
"A. No, I didn't.
 "Q. Did you, in fact, see some drugs located under the bed in the first bedroom in a shoe box or what appeared to be a shoe box?
"A. No.
"Q. Where was the purchase made please ma'am?
"A. In the living room I suppose.
"Q. In the living room?
"A. Yes, sir.
. . . . .
 "MR. PATTON CONTINUES: You did not go into the bedroom of Mr. Smith?
"A. I don't know if I did that day.
 "Q. Have you, on any occasion, seen the drugs or seen the shoe box of drugs located under the bed?
"A. I never saw any drugs, except for what I got."
At the end of the foregoing testimony the court overruled the motion to suppress and the jury was returned to the courtroom.
As can be seen from the foregoing excerpts from the record, the testimony of Sgt. Smelley was in direct conflict with that given at the suppression hearing by Martin and McCorkle. The general rule in Alabama has been that when conflicting testimony has been offered it becomes a question for the triers of fact to determine what the truth of the matter is. Sims v.State, 51 Ala. App. 183, 283 So.2d 635. See: Snipes v. State,50 Ala. App. 139, 277 So.2d 413.
In United States v. Thomas, 489 F.2d 664, the Fifth Circuit Court of Appeals adopted the following standards for evaluating affidavits which are alleged to contain misrepresentation which invalidate the search warrant. In that opinion the court proposed that evidence should be suppressed when there is either:
 ". . . (1) an intentional misstatement by an affiant-agent, whether material or immaterial to showing probable *Page 674 
cause; or (2) a negligent or unreasonable assertion in an affidavit, if material to showing probable cause, but not where (3) the mistake is innocent, even if material to probable cause."
In the present case the question is whether the misrepresentation was in good faith or with an intent to mislead. Smelley's testimony indicated that he told the magistrate what he thought to be true, that is, that the informant, Martin, had actually purchased the narcotics and had seen other narcotics in the presence of the appellant. His testimony, as we have said, was in direct conflict with that of McCorkle and the informant, Martin. It is our judgment that nowhere was it shown that Sgt. Smelley intentionally or negligently misrepresented the facts underlying the search warrant.
Based on the foregoing, the only question evolving from the facts was the weight and credibility to be attached to the testimony of the witnesses during the suppression hearing and this was a question for the judge who property determined this matter.
 II
The appellant contends that the evidence did not show that he was in constructive possession of the illegal drugs and knew of their presence.
The Supreme Court of Alabama in Radke v. State, 292 Ala. 290,293 So.2d 314, stated:
 ". . . when the presence of the accused at the scene is established and evidence of his knowledge of the presence of the prohibited substance is shown, along with any other incriminating evidence, the issue of the defendant's guilt should be submitted to the jury."
The evidence submitted on behalf of the State shows that some of the officers engaged in the search testified that they went to the premises identified as the home of the appellant. Danny Kimbrell of the Colbert County Sheriff's Department, acknowledged that he executed the search warrant for the defendant's home. James Long of the District Attorney's Office of Colbert County, was asked:
. . . . .
 "Q. Did you have occasion to go with a search party to the residence identified to you as that of the Defendant, Glenn Smith?
"A. Yes, sir."
Also, when Long was being questioned concerning State's Exhibit No. 4, which was a photograph depicting the bottle containing the incriminating drugs in the drawer where the item was found, he said that the photograph was made "In a bedroom of the home of Mr. Smith, that would be the first bedroom south of the living room." Robert Patterson, a State Trooper Sergeant with the Department of Public Safety was asked:
. . . . .
 "Q. And did you, along with other officers, go to the home identified to you as that of Glenn Smith, the defendant in this case?
"A. Yes, I did."
Sgt. Smelley and Sgt. Patterson each testified that the appellant, Glenn Smith, was present at the time the search was being conducted. Smelley stated:
. . . . .
 "Mr. Smith's wife, one of his daughters, possibly two of his daughters and I assume a neighbor, standing out in the front yard talking with him . . ."
were also present.
We recognize that the mere presence of the accused is not sufficient to establish the constructive possession necessary and that other facts and circumstances must be involved to establish the guilty knowledge of the illegal substance at the location where the appellant was present. Parks v. State,46 Ala. App. 722, 248 So.2d 761. However, we also recognize that guilty knowledge, that the appellant knew of the presence of the drugs, may be established by circumstantial evidence.Womack v. State, 34 Ala. App. 487, 41 So.2d 429.
Once ownership of the premises had been established it was reasonable for the jury to *Page 675 
infer that the bedroom, where the dresser containing the drugs was located, was that of the appellant since adult male and female clothing, and a pair of men's boots were found there.
The recent decisions of Williams v. State, Ala.Cr.App.,340 So.2d 1144 and Cook v. State, Ala.Cr.App., 341 So.2d 183, addressed the question of constructive possession of drugs where mere presence was shown. In Williams v. State, supra, this court in reversing the judgment observed:
 "At the time the motion to exclude was made, the State had only shown that the appellant was present in the apartment of some other person dressed in rumpled clothing, sans shoes and jacket. He retrieved both his shoes and his jacket from the bedroom when placed under arrest. Whether appellant knew that prohibited drugs were in the apartment, or whether the appellant exercised some dominion or control over the apartment is left to mere conjecture and speculation. . . ."
However, Williams v. State, supra, can be distinguished from the present case because the matter before us had the additional fact, apart from the presence of the appellant, that this was his residence. In Cook v. State, supra, we have the additional fact established of the appellant's residence in the house searched, whereas in Cook v. State, the appellant and his family were present but no evidence was adduced to indicate that that was his residence.
In view of the foregoing we believe there was evidence from which the jury could conclude that the appellant knew of the presence of the drugs in the bedroom, and it was not a matter of mere conjecture or speculation.
 III
The appellant insists that it was error to admit for the jury's consideration, the unidentified capsules, tablets and pills which were similar in appearance to the items charged in the indictment and alleged to be in the possession of the appellant.
This precise issue was considered in Wilcox v. State, Ala.Cr.App., 333 So.2d 202, and it was the opinion of this court that the presence on the premises of the tablets and other items, seized at the time of the search and not encompassed in the charge against the defendant, were admissible as part of the res gestae of the search and part of the same transaction. The court went on to say:
 ". . . a reasonable person would be impressed that the several rooms, residence and the curtilage room were used as a storage place for drugs and empty drug containers."
We hold that the facts in Wilcox v. State, supra, so parallel the facts in the present case that it is the decision of law controlling.
Further, the Supreme Court of Alabama in Brantley v. State,294 Ala. 344, 317 So.2d 345, has expressly approved the admission of other drugs found in an appellant's home at the time of a lawful search.
No error appears in the record; we therefore
AFFIRMED.
All the Judges concur.