HARRIS, Presiding Judge.
Appellant was indicted by the grand jury of Jefferson County for buying, receiving, concealing or aiding in concealing one two-door Chevrolet automobile, the property of Travis Lynn Hanna. At arraignment, in the presence of counsel, he entered a plea of not guilty to the charge against him. A jury found the appellant guilty, fixing the value of the automobile at four thousand dollars and the trial court sentenced appellant to two years of imprisonment in the penitentiary.
The sole issue on this appeal is whether or not police officers were required to give appellant Miranda warnings prior to asking him a question at his home. The sufficiency of the evidence to sustain the conviction is not preserved for review as appellant did not move to exclude the State’s evidence; did not move for a directed verdict; did not request the affirmative charge; did not move for a new trial, and no exceptions were reserved to the oral charge. A brief recital of the facts, however, is necessary to put the question raised in proper perspective.
Travis Hanna testified that some time in August, 1976, he owned a 1974 Monte Carlo which disappeared from the parking lot of *1317 Western Hills Mall in Jefferson County, Alabama. This automobile was white with a half-vinyl white “Landau” roof. A few months later, Hanna identified his automobile at a wrecker service in the Southside district of Birmingham, Alabama. Hanna explained that his automobile had a bumper guard on it, which was “pinched off” when he struck a rail, and a spare tire which was kept in the trunk was “worn on the inside.” Hanna further testified that he got the serial number of the car, 1H57R4B558073, from Kenny Wilson to whom he had sold the vehicle.
Paul Couch testified that he was a Sergeant of Detectives in the Jefferson County Sheriff’s Office. On approximately October 10, 1976, Couch was conducting an investigation in the area of Hanover Circle in Birmingham, Alabama. On that occasion, Couch observed appellant, driving a white Monte Carlo, which was later parked at 2764 Hanover Circle. The license number on the vehicle was 1 C 11164. Subsequently, having talked with Sergeant Clyde Am-berson, attached to the auto theft department, Couch accompanied Amberson to that address on October 14, 1976. After observing the same Monte Carlo parked at the residence, and after serial numbers were checked, Sergeant Amberson had the automobile “towed in.” Couch further testified that he later went to the same address alone. At that time Couch saw a different white Monte Carlo of approximately the same description as the one which had been towed in. This particular Monte Carlo did not have a Landau top and was dented.
Clyde Amberson testified that he was a detective sergeant with the auto theft division of the Jefferson County Sheriff’s Office. On October 14, 1976, Amberson went to 2764 Hanover Circle with Sergeant Couch where he saw a Monte Carlo bearing the serial number 1H57R 4B558073. The license number on the vehicle was 1 C 11164. Subsequent to checking these numbers, Amberson had the car towed in. Am-berson further testified that on October 18, 1976, another white Monte Carlo was parked at the address in Hanover Circle. However, this car did not have a Landau roof, although it was the same model. A Ralph Tucker dealer sticker was on the back bumper of this car.
Edmond K. Steadman testified that he was a custodian of records for the Jefferson County Department of Revenue and that he kept registrations of vehicles in Jefferson County. Tag number 1 C 11164 was issued in 1976 to a 1969 Plymouth Fury III in the name of Charlie E. Tripp.
At this point the State rested.
Ralph Tucker, Sr., appellant’s father, testified that he found a 1974 white Monte Carlo for sale at American Finance, run by his cousin, James Allfred, in Birmingham, Alabama, in September or October of 1976. Tucker took this car to show his wife in Brundidge, Alabama. However, Tucker testified, he returned the car to Birmingham, because his wife did not want it and left it at his sister’s house “out in Central Park.” Appellant later picked up the car and drove it to his home in Hanover Circle.
James H. Allfred testified that the Monte Carlo was taken on consignment at American Finance from a man named Charlie Stiles. Allfred allowed Tucker, his cousin, and the father of appellant, to take the car to show to his wife.
Jack Baxley, an employee of American Finance, testified to substantially the same facts as did Allfred. Baxley further testified that Charlie Stiles had died of a heart attack some time after leaving the Monte Carlo at American Finance to sell for him.
In rebuttal the State called Detective Sergeant Robert L. Graham, who testified on voir dire that he accompanied Sergeant Amberson to appellant’s home on October 14, 1976. There Graham observed a white 1974 model Monte Carlo. Graham further testified that he and Amberson knocked on the door of the house; appellant opened the door. Having asked appellant his name, Amberson told him that he was investigating the theft of an automobile and asked appellant “what he knew about the car out in front, the white one.” Appellant replied that he “knew nothing on it.”
*1318 Graham further testified that appellant was not under arrest at this time and was not arrested that day; nor was appellant threatened, or offered a reward or hope of reward for making a statement. Appellant was not advised of his Miranda rights before he answered Amberson’s question.
The trial court then conducted the following examination of Graham:
“THE COURT: All right. When he said nothing, I don’t know anything about it, what happened then? What happened then?
“A. He towed the car in to O’Conner-Weill.
“THE COURT: For what purpose?
“A. It was a stolen vehicle.
“THE COURT: You know it was stolen? “A. Yes, sir.
“THE COURT: Then what did you do? You knew it was stolen before you went up there and knocked on the door?
“A. No, sir. When we had it identified by VIN number.
“THE COURT: When?
“A. We ascertained it was stolen.
“THE COURT: Before you went and knocked on the door is what I am asking.
“A. Yes, sir.
“THE COURT: You knew it was stolen when you went up there and knocked on the door?
“A. Yes, sir.
“THE COURT: And he wasn’t under investigation for it?
“A. We was trying to ascertain.
“THE COURT: I understand that, but were you zeroed in on him?
“A. We asked him about the car, yes, sir.
“THE COURT: Was he under investigation is what I am asking?
“A. Yes, sir.”
Graham further testified that appellant was not arrested until Monday, October 18, 1976. Appellant was not arrested until then because no identification had been made of the car by the owner.
Following this testimony, the Court allowed appellant’s statement to be admitted into evidence, over appellant’s objection that Miranda warnings had not been administered.
Appellant contends that the police officers’ question amounted to custodial interrogation which triggered the requirement that he be apprised of his constitutional rights. Appellant notes that it is especially important to discern whether or not an investigation had focused on him as a suspect. This is the central thesis found in Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977. Thus appellant argues that the trial court erred to reversal.
We do not agree. In Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, “Custodial interrogation” is defined as:
. . questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.”
Appellant was not subjected to interrogation of the type found in Miranda, supra. Appellant was not under arrest, nor was appellant’s freedom of action impaired in any significant way. At the front door of his home he merely answered one question.
In Miranda, supra, the Court further held:
“General on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process is not affected by our holding. It is an act of responsible citizenship for individuals to give whatever information they may have to aid in law enforcement. In such situations the compelling atmosphere inherent in the process of in-custody interrogation is not necessarily present.”

“. . . (O)ur decision does not in any way preclude police from carrying out their traditional investigatory functions.” See Wright v. State, 54 Ala.App. 725, 312 So.2d 417.
Although the officers may have “zeroed in” on appellant, as the trial court chose to *1319 phrase it, by asking him about the car; this does not establish that custodial interrogation existed. In Sims v. State, 51 Ala.App. 183, 283 So.2d 635, this Court wrote:
“It is equally plain that ‘focus’ alone does not trigger the necessity for Miranda safeguards. In the absence of actual arrest something must be said or done by the authorities, either in their manner of approach or in the tone or extent of their questioning. One thing that is undeniable in the Miranda decision is that focus means custody, not that custody means focus. United States v. Hall, 2 Cir., 421 F.2d 540.”
A careful search of the record reflects no error injuriously affecting the substantial rights of appellant. The judgment of conviction is affirmed.
AFFIRMED.
All the Judges concur.