The defendant was indicted and convicted for rape. Sentence was fixed at life imprisonment. Two issues are presented on appeal.
 I
Initially the defendant contends that a statement he made to law enforcement officers prior to his arrest was inadmissible because he was a suspect, was in custody and had not been given his rights under Miranda v. Arizona, 384 U.S. 436,86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
Miranda is limited to custodial interrogations only. Custodial interrogation is defined as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way". Miranda, 86 S.Ct. at 1612. This is what was meant in Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758,12 L.Ed.2d 977 (1964), by reference to an investigation which had "focused" on the accused. Miranda, 86 S.Ct. at 1612, fn. 4.
The Miranda warnings are not required simply because the questioned person is one whom the police suspect or one on whom the investigation has focused. Oregon v. Mathiason,429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977); Beckwith v. UnitedStates, 425 U.S. 341, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976);Malone v. State, 361 So.2d 674 (Ala.Cr.App.), cert. denied,361 So.2d 691 (Ala. 1978). The "(c)riteria used to determine the necessity of Miranda safeguards include: probable cause to arrest, subjective intent of the police, subjective belief of the defendant, and focus of the investigation. Especially important is whether the focus of the investigation had finally been centered on the accused." Harrison v. State,358 So.2d 759, 761 (Ala.Cr.App. 1977), reversed on other grounds,358 So.2d 736 (Ala. 1978). While investigative focus is especially significant, it is custody and not focus which marks the point at which the Miranda warnings become mandatory. Mathiason, supra.
Applying the principles found in these decisions but mindful that each case must turn up on its own particular facts, we find that the defendant was not in custody when he made the objected-to statement to the police.
The victim was raped and robbed during the early morning hours of March 25, 1978. Apparently the assailant left his coat and hat in the victim's apartment. Two days later Assistant Chief Joe Filyaw of the Jasper Police Department was informed by two "fellows," whom he regarded as informants, that the coat and hat belonged to the defendant. Later that same day, at the maintenance area of the Massey Apartments, he received further information that the coat belonged to the defendant. Filyaw and two other officers began a search for the defendant. A radio dispatch informed them that he was in the Massey Apartment area. They found him at approximately 2:30 that afternoon, within one hour after they had begun their search.
Spotting the defendant walking down the sidewalk they pulled up "fairly close" to him at "a normal rate of speed". From this point on the events vary.
Chief Filyaw gave testimony that the defendant walked over to the unmarked police car. The defendant knew Filyaw and knew that he was a police officer. Filyaw was not in uniform and did not show the defendant his pistol or badge. The first thing Filyaw told the defendant was that he had a hat and coat he wanted him to view. The defendant identified the coat as being his and wanted to know where the police got it. The defendant stated that the cap did not belong to him. After the defendant identified the coat, Chief Filyaw told him "we found it in (the victim's) apartment and we were in the process of eliminating suspects in this case and would he mind coming to *Page 775 
City Hall with us. We wanted to take his fingerprints and photograph." Filyaw informed the defendant that it was a robbery and rape case. The defendant said that he would go and went "on his own free will". Filyaw never heard anyone tell the defendant that he did not have to go.
Filyaw testified that he stopped the defendant because of the "word from the informants" but that he had no reason to hold him at that time. At no time was the defendant physically restrained or was any overt act employed to keep him from leaving. At one point Chief Filyaw testified that the defendant could not have left but that he "did not object". Later Filyaw explained that the defendant was "more or less free to go".
The defendant was the only suspect when stopped by the police although there was at least one other suspect whom the police questioned at some other time. Although all three officers got out of the automobile, Filyaw was the only one to talk to the defendant. Filyaw was uncertain of the position each officer took after getting out of the vehicle except that one was standing behind him. After arriving at the police station and while the defendant was being photographed and fingerprinted, Filyaw went and talked to the District Attorney. He returned with a warrant for the defendant's arrest.
Officer Billy Sheffield was the driver of the automobile. He testified that they had received word that the defendant had been seen wearing a coat and cap "like" the ones recovered from the victim's apartment. They thought that the defendant "might be a witness to who the coat belonged to". When they pulled alongside the defendant and stopped, the defendant came over before anyone got out of the car. Chief Filyaw rolled down his window and asked the defendant if he could talk with him for a minute. "The Chief told him we were in the process of eliminating suspects and we wanted to see if he could identify the contents that we had there and he said yes. So, we got out of the car and the Chief showed it to him." Sheffield stated that, "We brought him down to eliminate him as a suspect. He wasn't under arrest at the time he came with us. He came voluntarily." The defendant was "free to leave at any time and choose to answer any questions". Sheffield testified that "Assistant Chief Filyaw told him he didn't have to answer the questions when we first stopped him. He said you don't have to answer any questions, but we would like to ask you a few questions. We are trying to eliminate suspects on this case." After the defendant identified the coat, "We asked him would he mind us taking the prints to compare them with what we found. * * * * He said, no he wouldn't mind, that he would do it." No force or coercion was employed.
Sheffield testified that the defendant was not told he could not leave and was not told that he had to answer questions. He was not told that he had to go to City Hall but was told that he did not have to go. All three officers got out of the car and he and Officer Huffstutler stood by the automobile.
Officer Roy Huffstutler testified that when they spotted the defendant Chief Filyaw got out of the car and called him by name. Filyaw "explained to him why we stopped to talk to him. He told him we had a coat and a hat that was left at a scene and asked Leon if he would take a look and see if he could identify it." Huffstutler stated that he was "observing" the defendant "in the event he made a break or ran" and that the defendant "had been known to run". Huffstutler did not tell the defendant that he did not have to answer any questions.
The defendant and Huffstutler rode in the back seat of the unmarked police vehicle to the police station. He was not handcuffed during this time. At the station, Officer Huffstutler explained to the defendant "the procedure we were going through". The defendant did not request a lawyer. Huffstutler fingerprinted the defendant and testified that the defendant did not refuse to sign the fingerprint card but "said he couldn't see it to sign it". After Huffstutler compared the prints of *Page 776 
the defendant with those found at the scene of the crime, he arrested the defendant. This was before Chief Filyaw returned with the warrant.
In contradiction to the testimony of the police officers, the defendant stated that the automobile "almost hit" him and three men jumped out, surrounded him and grabbed his arm. Huffstutler "looked like he was fixing to pull his gun out". The defendant stated that he "didn't feel he was free to go".
We have compared the facts present in this case with those found in others. See 31 A.L.R.3d 565 (1970). This case illustrates that the question of determining whether a defendant has been subjected to custodial interrogation requiring Miranda is not an easy one. Hill v. State, 6 Div. 678, (Ala.Cr.App. Ms. June 26, 1979). The trial judge found on conflicting testimony that there was no custodial interrogation and that the defendant's admission of ownership of the coat was voluntary. Although we have reviewed the facts and circumstances independently, his findings must be given great weight. Malone, 361 So.2d at 687. When the defendant was initially stopped, the police did not have probable cause to arrest. The trial court specifically found that, when the defendant was stopped, the police only had the uncorroborated information of an unnamed informant and that this would not constitute probable cause for arrest.
The defendant testified, in effect, that he thought he was in custody. However, the subjective beliefs of the defendant are not to be the determining factor in deciding this issue.Malone, 361 So.2d at 688.
The police intended to take the fingerprints of the defendant for "elimination" purposes in their investigation. This factor in and of itself would not create a custodial situation and require the Miranda warnings. Hancock v. Estelle, 558 F.2d 786
(5th Cir. 1977). The police also intended to discover the ownership of the coat. A similar, though not identical situation is found in People v. Martin, 78 Mich. App. 518,260 N.W.2d 869, 873 (1977).
 "At the time the defendant was approached by the officers, only an anonymous informer's tip was being investigated. Although defendant was the sole suspect, no probable cause existed to make an arrest. See People v. Orozco, 74 Mich. App. 428, 253 N.W.2d 786 (1977). When defendant voluntarily accompanied the officers outside the tavern, only one question was posed to him in an effort to ascertain the accuracy of the informant's information. Clearly, the investigative process was not thereby altered into an effort to compel incriminating statements from the suspect. No intent by the officers to restrain defendant's freedom in a substantial way for the purpose of compelling the utterance of incriminating statements was shown by the circumstances."
* * * * * *
 "Without something to establish that defendant's freedom was substantially restrained in an effort to subject him to coercive interrogation, we cannot say that his answer to the officer's question was compelled, that his free will was overcome by the coercive energy of the government."
See also United States v. Gibson, 392 F.2d 373 (4th Cir. 1968).
The record reveals no information concerning the two informants other than that they were waiting for Chief Filyaw in his office two days after the crime and that Chief Filyaw regarded them as informants.
The defendant was not "interrogated" but was simply requested to identify a coat and hat. He was only questioned by Chief Filyaw and only asked one question. See Tucker v. State,362 So.2d 1316 (Ala.Cr.App. 1978). The question was not accusatory and no mention was made to the defendant that the officers had already been informed that the defendant had been seen wearing a similar coat. When questioned the defendant was on the sidewalk or street in a familiar neighborhood. Once the defendant admitted ownership of the jacket he was not questioned further. *Page 777 
Each officer was out of uniform and, apart from the defendant's own testimony, there is no evidence that any officer exhibited any type of physical or emotional restraint upon the defendant apart from that inherent in any type of confrontation with a police officer. Compare Harrison, supra, where the suspects were ordered to fall to the ground on their hands and knees. The automobile driven by these officers was unmarked. There was no inherent coerciveness or intimidating atmosphere at the place where the defendant was stopped or in the officers' appearance and demeanor.
The investigation had focused on the defendant to the extent that he was the only suspect the investigating officers had at that time. However, focus in and of itself is not the determinative question in determining the existence of custody.Mathiason supra; Sims v. State, 51 Ala. App. 183, 283 So.2d 635
(1973).
Although the defendant was not told he was free to leave, he was not told he had to remain. While he probably would have been stopped had he attempted to flee, there was no evidence outside the defendant's own statements that this intention or attitude was ever communicated to the defendant. The courts are in general agreement that an undisclosed intent to arrest cannot transform a noncustodial situation into a custodial one. J. Smith, "The Threshold Question in Applying Miranda: What Constitutes Custodial Interrogation?" 25 So.Car.Law Rev. 699, 712 (1974).
The officers' testimony indicates that the defendant was requested, and not ordered or directed, to identify the garments and to go with them to the police station. The State's evidence is that the defendant knew exactly why he was going to the station and that he went knowingly, freely and voluntarily without force or coercion.
The defendant was almost twenty-three years old and had several prison sentences in both Alabama and Ohio for burglary.
From the evidence presented we do not find the presence of the coercive environment condemned by Miranda. The findings of the trial judge must be upheld since there is evidence which indicates that the defendant was not in custody when he identified the jacket. See Barfield v. Alabama, 552 F.2d 1114
(5th Cir. 1977); Starkey v. Wyrick, 555 F.2d 1352 (8th Cir. 1977).
 II
Relying mainly on Davis v. Mississippi, 394 U.S. 721,89 S.Ct. 1394, 22 L.Ed.2d 676 (1969), the defendant maintains that his fingerprints were obtained after an illegal arrest and consequently were inadmissible at his trial.
Davis stands for the proposition that "detentions for the sole purpose of obtaining fingerprints are no less subject to the constraints of the Fourth Amendment." 89 S.Ct. at 1397. InDavis, it was held that fingerprints which were obtained during the illegal detention of the defendant were inadmissible at trial.
The trial court found, and we agree, that once the defendant had identified the jacket he would not have been released and was, in fact, in custody. However, the State's evidence shows that the defendant freely volunteered to be photographed and fingerprinted. When a defendant is in custody the Miranda
warnings are not required before he is photographed or fingerprinted. United States v. Gibson, 444 F.2d 275 (5th Cir. 1977); Lindsey v. State, 331 So.2d 797 (Ala.Cr.App. 1976);Shiflett v. State, 52 Ala. App. 476, 294 So.2d 444, cert. denied, 292 Ala. 749, 294 So.2d 448, cert. denied,419 U.S. 867, 95 S.Ct. 124, 42 L.Ed.2d 105 (1974).
Here there was no illegal detainer as the defendant freely consented to be photographed and fingerprinted. Starkey v.Wyrick, 555 F.2d 1352 (8th Cir. 1977). There is no question that a defendant may waive his Fourth Amendment rights.Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041,36 L.Ed.2d 854 (1973).
We have searched the record for error prejudicial to the defendant and found *Page 778 
none. The judgment of the circuit court is affirmed.
AFFIRMED.
All the Judges concur.