DeCARLO, Judge.
This is an appeal by an indigent from a conviction of burglary of an inhabited dwelling in the nighttime, with the intent to ravish, wherein appellant was sentenced to fifteen years imprisonment. His judgment of conviction is before this court for review, for which appellant has been provided a free transcript and appointed counsel, who was also appointed to represent him at trial.
On October 25, 1977, the victim was living in a house located on Loch Haven Drive in Hoover, Jefferson County, Alabama, with her eleven-year-old son. She testified that, on the night in question, she had been out with her boyfriend, Larry Chandler, and that, after they returned, they watched television until approximately 11:45 P.M.
As her boyfriend left the house to go to his car, they heard the sound of footsteps on the road near her house. It was raining at the time her friend left and he told her that he would “circle around the block, to see if he could see anyone.” She returned to the house, locked the front door and went to bed about 12:30 P.M.
At trial, the victim stated that the house had two rear doors which were locked on the night in question. She explained that the back doors also had “night locks,” which were “[t]he kind where you have the chain.”
The victim recalled that she was awakened around 4:00 A.M. and saw someone standing at her bedroom door. She stated that she “could tell from the shadow in the doorway that it was a man.”
The victim gave the following account of what occurred next:
“I came up half-way out of bed and started to scream, and he kicked the door to and came over there, and, with one hand, he pushed me down on the bed and took the other one and put it over my mouth and told me not to scream. . . .”
She said that the man told her not to scream and that he would remove his hand if she promised she would not scream.
She stated that her assailant told her that he “didn’t want to wake up the kid in the *1000 next room, and if I would do what he said do he wouldn’t hurt me or the kid in the next room.” Further, the victim said that the man told her that he was going to rape her.
She testified that she asked her assailant, “Let’s talk; please, let’s talk.” At that point, the man let her sit up on the bed, but held her hand, and asked, “What do you want to talk about?” She said that she pleaded with him but that he told her, “There’s been enough talk. That’s enough.”
The victim said that the man then told her to remove her clothes. When she started to remove her gown, she reached for a gun on the night-table on the left-hand side of the bed.
At trial, she described the gun as a .22 caliber, black with a white handle, bearing a “steerhead design on the handle.” Further, she stated that “[i]t had about four bullets, I believe, in it. They were twenty-two longs.”
The victim went on to say that, as she reached for the gun, her assailant saw her reach for it, took the gun from her, pointed it at her and said, “now lady I mean business you understand.” At that point, she was ordered to walk to the bedroom door and lock it.
She stated that, during the time the man was in the room with her, the room was completely dark and that, after she removed her gown, the appellant had sexual intercourse with her.
According to the victim, after her assailant had dressed, he pulled the bed linen over her head and said that he was going to turn on the light and make sure he had not left anything. The victim stated that, before leaving, her assailant told her he was going to check the house for fingerprints and that he was also going to take the telephone “off the hook.” She said that, at that point, she asked her assailant what he was going to do with the gun and he responded that “he was going to take it with him.”
She stated that she stayed in the bed until after she heard the door close. Then she got up, went to the den and replaced the telephone, returned to her bedroom and called her ex-husband. After “about fifteen minutes,” her ex-husband arrived and called the police.
Later, Hoover uniformed police officers arrived at her home and, while they were there, the victim observed that the chain on the back door had been broken. She testified that, at that time, she also gave the police officers a description of her assailant, “as best I could.”
The victim testified at trial that she could not make an identification of her assailant and said that she had never seen the appellant before.
At the conclusion of this statement, the district attorney directed the victim's attention to the 8th day of November, 1977. At that point, defense counsel requested a conference at the bench. Subsequently, the court dismissed the jury from the courtroom and testimony was taken on the appellant’s motion to suppress, which he had filed prior to trial.
During the suppression hearing, the victim testified that, on November 8, 1977, around 11:00 P.M., she was at home with her boyfriend, Larry Chandler. She said that her son was in bed at that time, and that, while they were watching the television in the den, Chandler fell asleep on the floor. She said that she was lying on the couch but was not asleep.
She testified that she heard something outside, and stated, “I raised my head up off the pillow, and I heard just a jiggling sound at my back door and I could tell that somebody was coming in.” At that point, Chandler, who had a pistol, was awakened and, when the door opened, he called out, “Halt, or I will shoot.” According to the victim, the intruder ran from the house and Chandler chased him.
The victim testified that, when she talked with the police on October 25th or 26th, she gave them the description of the pistol that her assailant had taken. She stated that *1001 she also told them that “it had four bullets in it.”
During voir dire cross-examination, she stated that she had talked to the police about the gun on the night of October 25th but that she did not know if she had given them a description of it that evening. However, she did state that her ex-husband had described the pistol to the police as a “twenty-two caliber.”
Further, the victim stated that the statement by her ex-husband that the gun was “a twenty-two caliber revolver” was made to the police in her presence. But, she said, “I’m not sure I heard him say it was ‘long’. He could have said something about it.” However, she acknowledged that she had not mentioned anything about the pistol being a “twenty-two caliber long,” to Sgt. Ray, and added, “My husband talked to him about the gun because he said he knew more about it than I did.”
Hoover Police Sgt. Don Ray testified that he had conducted an investigation of the assault on October 25,1977. Ray also stated that the preliminary investigation was made by Sgt. French and Officer Beard.
Sgt. Ray testified that he recalled the victim telling him that a .22 caliber long pistol was taken from her possession on the night of the assault. He swore to that statement in the affidavit supporting the search warrant issued for the appellant’s apartment. Ray stated that the victim’s husband also told him about the pistol.
Further, Ray said it was his belief that the “Incident Report” made by the investigating officer described the pistol as a “twenty-two caliber.” However, he was not sure, without looking at the report, whether the report also said “long.”
Ray stated that, when the appellant was arrested on November 8th, he himself did not search the appellant, but it was his belief that the appellant was searched when he was placed under arrest by Sgt. French.
Ray stated it was his best recollection that, at the time of the arrest, Larry Chandler asked the appellant “there in the street, ‘Why did you rape my girlfriend?’ ” The appellant’s response was, “I didn’t mean to harm her. I really didn’t mean to hurt her.”
Ray said that Larry Chandler and Sgt. French told him that the intruder had said “he did not mean to rape her.” Ray said that this statement by the appellant was made in Officer French’s presence.
Sgt. Tom French of the Hoover Police Department stated that, on November 8, 1977, he responded to a radio call and went to the victim’s residence. He said that, when he got to the intersection of Loch Haven and Rocky Ridge Road in Hoover, Alabama, he stopped his patrol car and heard a man yelling, “Over here, over here.”
French stated that, at that time, he saw two men on the ground and that one of the men was armed with a pistol and had his knee in the back of the other. French said he later learned that the man armed with the pistol was Larry Chandler and that he was holding the appellant at gun point.
French stated that he took the pistol from Chandler and then searched the appellant. According to French, when they picked the appellant up, Chandler came up to him and started yelling at the appellant. He wanted to know why the man had raped his girlfriend. French stated that the appellant’s response was, “I didn’t mean to harm her.”
French said that he informed Sgt. Ray of Chandler’s questions and the appellant’s response. Further, French acknowledged that the appellant did not, in his presence, use the words, “I didn’t mean to rape her.”
French stated that the appellant had a billfold at the time he was searched and that French had turned the billfold, and the appellant’s other personal effects, over to Sgt. Ray before taking the appellant to jail. French stated that, in the appellant’s coat pocket, he found “two twenty-two caliber long bullets.”
Larry Chandler testified that he was in the victim’s house on the morning of November 8th and was awakened by the victim, who said, “This is it. He has come *1002 back.” At that point, Chandler said he rolled over and “cocked my pistol.”
Subsequently, the den door opened and a person stuck his head in the door. Chandler said that, at that point, he shouted, “Halt, or I’m going to kill you.” According to Chandler, the man ran off and he pursued him. He said the man ran to a car and tried to get in and that, when Chandler placed his hands on him, the man pulled away.
Chandler said that, after catching the man, “I asked him why did he do what he did before, and he said: ‘I’m sorry. If you let me go, I will never bother you all again. I didn’t mean to do it.’ ”
Chandler said that he did not remember whether the appellant had used the word “rape.” Further, Chandler testified as follows: “No, I never said — well, I don’t know if I said it. I might have, you know, but I don’t remember saying the word ‘rape.’ ”
Chandler stated that he remembered talking to a police officer but that he did not believe it was Sgt. Ray. Further, he testified that he remembered talking to a district attorney at the courthouse but said he did not remember using the word “rape” then or in his statement to the district attorney.
At the end of Chandler’s testimony, the testimony on the motion to suppress was concluded and the court overruled the motion to suppress.
At that point, the jury was recalled to the courtroom and the victim continued her testimony. She gave substantially the same testimony that she had given during the suppression hearing.
However, during the trial, the victim identified the pistol taken from her on the night of the assault and said that it was in the same condition, except that at the time it was taken, it did not have rust on the barrel. She added that, at the time of the assault, it was raining outside. She said that, sometime after November, 1977, Sgt. Ray brought the pistol to her house for her identification.
During cross-examination, the victim stated that, from the time her assailant entered her home until he left, some thirty minutes had elapsed. She described her assailant as follows:
“He would be medium height tall to me. That is what I mean by ‘tall’ . Five-nine to five-ten.”
Further, she said that, on the night in question, her assailant’s hair was “extremely wet.”
She also said that she believed that she had told Sgt. Ray that the pistol taken from her residence was a “twenty-two long.” She explained that this was her best recollection of Her statement and that “long” meant “where the bullets are longer.”
Larry Chandler testified that, on the night of the assault on his girlfriend, he had visited her home and that, as he was leaving, they heard someone walking outside. When he went to his car, Chandler saw a man walking down the street in the rain.
Chandler explained that he heard the man before he saw him. Chandler went on to say that the man “had on heavy boots, or had boots of some type that you could hear him walk. Like these shoes, here, [indicating]. They were heavy, hard shoes. You could hear him walk.”
Chandler also testified that he recalled being at the victim’s house on November 8, 1977, and that, on that occasion, he was awakened by the victim and observed the back door open. He said that he chased the intruder, whom he caught some distance from the house. Chandler identified the appellant as the man he caught on that occasion and stated that the appellant said, “I’m sorry I did it and I won’t bother you again.”
Chandler said that after the appellant was taken into custody he had a conversation with the police officers and that it was sometime during that period that he identified the victim’s gun.
During cross-examination, Chandler stated that he had asked the appellant, “Why did you do what you did before?” and that the appellant had responded “that he was *1003 hungry, that he just wanted to get something, he was starving to death.” Chandler explained that he did not know whether the appellant was talking about the first or the second occasion that he came to the victim’s home, and said, “he could have been talking about any time.” Also, Chandler stated that he could not say whether he [Chandler] had used the word “rape” in front of Sgt. Ray.
Sgt. Tom French stated that, on October 25, 1977, he was accompanied by Officer Lester Beard in making an investigation of the assault. He testified that, during the investigation, he observed that the “night latch,” or chain lock, on the back door of the victim’s house was broken.
French said that he went to the victim’s house again on November 8, 1977, in response to a radio dispatch. He stated that he was accompanied by Officer Ronnie Williams, and that, when they arrived, they heard someone calling, “Over here, over here.”
French stated that he and Williams ran in the direction of the sound and found Chandler and the appellant on the ground. French stated that, after picking the men up from the ground, they started to handcuff the appellant.
At that point, according to Sgt. French, Chandler asked the appellant, “why hé raped his [Chandler’s] girlfriend.” French recalled that Chandler was “quite excited, and mostly out of breath.”
French said that, about that time, Officer Beard arrived and he instructed Beard to go with Mr. Chandler. French said he then took the appellant to the Hoover City Hall.
Sgt. French stated that, when he arrived at the city hall, he searched the appellant again and, in the appellant’s pocket, he found “[t]wo twenty-two caliber long cartridges.” He said that these items were placed in an envelope and given to Sgt. Ray.
During cross-examination, French stated that he also communicated to Sgt. Ray what the appellant had said at the time he was arrested.
Sgt. Don Ray testified that, on the date of the assault, he had not gone to the victim’s house but had talked to Sgt. French at the Hoover Police Department. He said he later had a conversation with the victim at Cooper Green Hospital in Birmingham.
Sgt. Ray stated that, on November 8, 1977, he saw the appellant while in custody and that, at that time, Sgt. French told him what had occurred. Further, he stated that he was then given two .22 caliber long bullets.
Ray said that, on the morning of November 8, 1977, he went to the Jefferson County Courthouse accompanied by Larry Chandler. At that time, they had a conversation with a deputy district attorney concerning obtaining warrants for the appellant.
Ray stated that, at that time, he requested a search warrant based on the testimony that Larry Chandler had made to the deputy district attorney. He said that, after the search warrant was executed, the appellant’s apartment was searched and the .22 caliber revolver was found beneath the mattress in the appellant’s bedroom. They also found “one twenty-two caliber long pistol bullet” on the appellant’s dresser in the bedroom and a pair of “paratrooper jump boots that are lace boots.”
During cross-examination, Sgt. Ray testified that he believed that the appellant’s address was 1521-R, 16th Ave. South, because this was the address that appeared on his driver’s license. When the search warrant was executed he also found that appellant’s name appeared on the mail box for that address.
Ray recalled that the victim had described her assailant as being approximately six feet tall, one-hundred and seventy pounds, and had stated that, after the assault, she had heard the assailant lacing up some boots.
On re-direct examination, Sgt. Ray testified that, after he recovered the pistol from the appellant’s apartment, he went directly to show it to the victim.
*1004 At the end of Sgt. Ray’s testimony, the victim was recalled and testified that, on the night of the assault, she could hear her assailant, while he was disrobing, unlacing his boots. During cross-examination, she stated that she had told Sgt. Ray, on October 25, 1977, that she could smell the odor of onions on her assailant’s breath.
At that point in the trial, Sgt. Ray was recalled and testified that, at the time he searched the appellant’s apartment, on November 8, 1977, he found some clothing with the emblem of “Wendy’s Hamburgers.” He stated that he also found a pair of “paratrooper boots,” which “are brown, high type boots, with laces,” next to the bed.
At the end of Sgt. Ray’s testimony, the defense recalled Larry Chandler for further cross-examination. He testified that he never saw the search warrant for appellant’s apartment, but remembered going before the magistrate and being placed under oath. He stated that he did not know the contents of the search warrant and could not swear that it contained his statements. Further, he said that the appellant had not used the word “rape” in his presence.
Sgt. Ray was recalled for further cross-examination and testified that he had seen the appellant’s drivers license in his billfold. Ray explained that it was “the new type” that bore the person’s picture on the license.
At the end of Sgt. Ray’s testimony, the defense made a motion to exclude the State’s evidence and the court overruled the motion. Appellant did not take the stand in his own behalf and the defense, at that time, called Fred Hughes, a former manager of the “Captain D” restaurant. He testified the appellant had worked for him at the restaurant in Bessemer, Alabama. Hughes stated that the appellant had an aversion to onions and that the appellant “broke out crying” and his eyes swelled “like balloons,” on the only occasion Hughes had seen him cut onions. Hughes said that, as a result, the appellant was excused from the duty of preparing onions.
During cross-examination, Hughes stated that it was his belief that the appellant quit working at the restaurant around “the first of October, I believe, because I quit shortly afterwards.” At the end of Hughes’ testimony the defense rested its case and the State called, in rebuttal, Sgt. Ray.
Sgt. Ray testified that he had spoken with one of the managers of the Wendy’s food chain and determined that the appellant had gone to work there around October 18, 1977.
Billy Wentz, the manager of Wendy’s Hamburgers in Birmingham, Alabama, testified in rebuttal for the defense, and stated that the appellant started to work as a manager trainee for Wendy’s on October 31, 1977. Further, he stated that it was part of the appellant’s duty to cut onions and that he did not recall whether the appellant was allergic to onions. Wentz added, however, that the appellant “would cry like everybody else.”
At the end of Wentz’s testimony, the defense completed its case.
I
The appellant contends that the trial court was in error when it overruled his motion to suppress. He argues that, “[W]hen material statements, in search warrant sufficient on its face, are impeached, contradicted and proven erroneous,” the search warrant is rendered invalid and the products of the resulting search are due to be suppressed and excluded as evidence.
The supporting affidavit to the search warrant, which was sworn to by the affiant officer, including the alleged false statement, appears as follows, omitting the victim’s name in order to preserve her anonymity [emphasis is placed on the statement alleged to be false]:
“Before me, Judge of the District Court of Jefferson County, personally appeared Sgt. Don Ray, Hoover Police Department, Jeff. Co., Alabama, who, after being duly sworn, upon his oath deposes and says as follows:
“On October 25, 1977, at approximately 4:00 A.M., the residence of [the victim], *1005 3425 Loch Haven Drive, Hoover, Jefferson County, Alabama, was broken into by an unknown white male. [The victim] confronted said white male with a pistol, white male took the pistol away from [her] and raped her. Said white male then left said residence.
“On November 8, 1977, at approximately 1:30 A.M. the residence of the said [victim] was again broken into and the intruder was confronted by [her] boyfriend, Larry Chandler. Said Larry Chandler confronted intruder with a pistol and the intruder broke and ran out the back door which he had entered. Said Larry Chandler pursued the intruder, never losing sight of him and apprehending said intruder, Larry Chandler asked him why he did what he did two weeks ago and said intruder said that he did not mean to rape her; he didn’t know why he did it. Members of the Hoover Police Department arrived immediately thereafter, took the intruder into custody and he was subsequently identified as Terry Eugene Brumback, who gave his address as 1521-R 16th Avenue South, Birmingham, Jefferson County, Alabama. When taken into custody, said Brumback was searched and two .22 caliber long cartridges were recovered from his person. [The victim] informs me that the .22 caliber pistol which the intruder took from her on October 25, 1977, was loaded with .22 long cartridges.
“Based on the above information, I have probable cause to believe and do believe that the .22 caliber pistol taken from [the victim] is presently being concealed at 1521-R 16th Avenue South, Birmingham, Jefferson County, Alabama.”
The appellant insists that the testimony shows that the word “rape” was never used by the appellant and that the victim never testified that the pistol taken from her was loaded with .22 caliber long cartridges. Further, appellant claims that, without the two allegedly false statements, there was no showing of probable cause to search his apartment. He maintains that the testimony of Sgt. Ray concerning the use of the word “rape,” and any evidence concerning the .22 caliber pistol should have been suppressed.
As can be seen from the testimony outlined above, the victim testified that it was her belief that she had given a description of her pistol to the police but that she later testified that she could not remember whether she gave the police a description of the pistol. However, she stated that her ex-husband had described the pistol to the police in her presence. In her testimony, she described the gun as a .22 caliber pistol, which was loaded with four bullets at the time it was taken. She added that she did not remember whether the word “long” was mentioned in relation to the cartridge size, but, during further testimony, she explained that “long” referred to the size of the cartridge.
Sgt. Ray testified that the victim and her ex-husband reported to him that a .22 caliber long pistol was taken from her on the night of the attack. However, he stated that he was “unsure whether the police incident report contained the word ‘long.’ ”
The record reflects that Sgt. Ray testified that Larry Chandler had told Sgt. French that the appellant made the statement, upon being apprehended, that “he [appellant] did not mean to rape her.” Sgt. French’s testimony was to the effect that Larry Chandler asked the appellant why he had raped his [Chandler’s] girlfriend and that the appellant had responded that he did not mean to harm her. It was French’s testimony that Chandler, not the appellant, had used the word “rape.” These statements were communicated to Sgt. Ray.
Chandler testified that he had asked the appellant “why did he do what he did before,” and stated that he did not remember whether he or the appellant had used the word “rape.”
In support of his contention that the evidence in question should have been suppressed, the appellant relies upon McConnell v. State, 48 Ala.App. 523, 266 So.2d 328, Brown v. State, 42 Ala.App. 429, 167 So.2d 281, and U. S. v. Thomas, 489 F.2d 664.
*1006 McConnell v. State, supra, can be distinguished from the case under consideration. There, a search warrant was held invalid when material statements contained in the affidavit were subsequently contradicted and proved erroneous through the testimony of the affiant officer. In the present case, the affiant officer testified that the statements he had sworn to in support of the affidavit were those made by the victim and the victim’s boyfriend, Larry Chandler.
We also distinguish Brown v. State, supra, because the supporting affidavit indicated that the affiant had personal knowledge that contraband liquor was on the premises. However, at trial, it was shown that the affiant had received his information from anonymous telephone calls. In the present case, the affiant officer was quoting statements which he maintained had been made by the victim’s boyfriend and by another investigating officer.
We would also point out that, in U. S. v. Thomas, supra, the affiant agent had a good faith belief, based upon his investigation, that he had used the appellant’s correct name in the affidavit, although he had been referred to by a nickname by informants and his proper name was not the one used in the affidavit.
The requirements necessary to void a search warrant containing false representations are set out in Franks v. Delaware, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667. There, the United States Supreme Court acknowledged that there is a presumption of validity with respect to affidavits supporting search warrants.
However, the court went on to say that, in order to void a search warrant, it must be established by a preponderance of evidence that the affiant made a false statement, knowingly and intentionally, or with reckless disregard for the truth. Further, the alleged false statement must have been necessary for the finding of probable cause. The Supreme Court also stated that allegations of negligence, or innocent mistakes, are not sufficient to void a search warrant otherwise properly executed.
In the instant case, testimony by the affi-ant officer shows clearly that the statements which he made in the affidavit supporting the search warrant were made in good faith and were based upon his investigation. Sgt. Ray never wavered in his testimony and never contradicted his original statements contained in the affidavit.
The testimony of the victim and her boyfriend, Larry Chandler, shows that both were not as positive of their statements. However, at no time was there any showing of perjury or that any witness knowingly made any false statement or did so with reckless disregard for the truth.
This court, in Smith v. State, Ala.Cr.App., 351 So.2d 668, which concerns whether a police officer intentionally or negligently misrepresented the facts in a supporting affidavit, stated that the general rule .in Alabama is that conflicting testimony presents the question for the trier of fact. The court went on to say:
“[T]he weight and credibility to be attached to the testimony of the witnesses during the suppression hearing . was a question for the judge . . . .”
Based upon our examination of the testimony at trial and at the suppression hearing, we are of the opinion that sufficient evidence was presented to warrant the trial judge’s finding that the statements contained in the supporting affidavit were not knowingly and intentionally falsified and the motion to suppress was properly denied.
Further, it is our judgment that appellant’s motion to exclude the State’s evidence was properly denied. The evidence submitted by the State was sufficient to raise questions of fact for the jury and to sustain appellant’s conviction. Young v. State, 283 Ala. 676, 220 So.2d 843; McHellen v. State, Ala.Cr.App., 351 So.2d 689.
We have examined the record and have found no error prejudicial to this appellant. Therefore, the judgment of conviction of the Jefferson Circuit Court is affirmed.
AFFIRMED.
All the Judges concur.